UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

DENISE M. LYMAN,

                Plaintiff,

- against -

THE NEW YORK AND PRESBYTERIAN
HOSPITAL; MARIA LAPORTA; and
WALDNER'S BUSINESS ENVIRONMENTS, INC.

                Defendants.

-------------------------------------------------------------------x

**11 CIV 3889**

ECF Case

COMPLAINT

PLAINTIFF DEMANDS
A TRIAL BY JURY

        Plaintiff Denise Lyman ("Lyman" or "plaintiff"), through her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendants The New York and Presbyterian Hospital, ("NYPH"), Maria LaPorta ("LaPorta"), and Waldner's Business Environments, Inc. ("Waldner's") (collectively "defendants"), as follows:

<u>NATURE OF ACTION</u>

        1.    This action is brought to remedy NYPH's discrimination in the terms, conditions, and privileges of employment based on disability and retaliation against Lyman in violation of the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 et seq. (the "ADA"); the New York State Human Rights Law, Executive Law § 290 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-107 et seq. (the "City Law"). This action also is brought to remedy LaPorta and Waldner's aiding and abetting NYPH's discrimination and retaliation against Lyman in violation of the ADA, Executive Law, and City Law, as well as to remedy LaPorta and Waldner's intentional interference with Lyman's business relations in violation of New York common law.

310505 v2

2.     Injunctive and declaratory relief, damages, statutory penalties, and other appropriate legal and equitable relief are sought pursuant to the ADA, the Executive Law, the City Law, and New York common law.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and Section 107(a) of the ADA, 42 U.S.C. § 12117(a) (which incorporates by reference Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5(f)(1) and (3), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a(2)).   This Court has supplemental jurisdiction over plaintiff's Executive Law, City Law, and New York common law claims pursuant to 28 U.S.C. § 1367, because plaintiff's Executive Law, City Law, and New York common law claims closely relate to her ADA claim, and arise from a common nucleus of operative facts such that they form part of the same case or controversy.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendants regularly conduct business within the Southern District of New York.

5.     On or about March 23, 2010, plaintiff filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC"), complaining of the acts of disability discrimination and retaliation alleged herein. On or about March 10, 2011, plaintiff received from the EEOC a notice of right to sue.

6.     Pursuant to § 8-502(c) of the City Law, plaintiff, prior to filing this Complaint, served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York. Plaintiff has complied fully with all prerequisites to jurisdiction in this Court.

## PARTIES

7.      Plaintiff is a resident of New York.  Plaintiff was employed by NYPH from July 2006 until the involuntarily termination of her employment on December 16, 2009.

8.      Plaintiff is a 56-year-old woman who suffers from severe degenerative arthritis in one of her hips.  Plaintiff has had at all relevant times a "disability" as that term is defined in the ADA, the Executive Law, and the City Law.  At all times during her employment with defendant NYPH, plaintiff was able to perform the essential functions of her job, with or without reasonable accommodation, and therefore was at all relevant times a "qualified individual with a disability" within the meaning of the ADA.

9.      Defendant NYPH is a New York corporation that provides hospital services in the State of New York.  NYPH is an employer within the meaning of the ADA, the Executive Law and City Law.

10.     Defendant LaPorta is an individual who NYPH employed as a design project manager and site director from approximately the mid 1990s through 2010.  LaPorta supervised Lyman at NYPH from July 2006 through December 2009.

11.     Defendant Waldner's is a New York corporation and furniture vendor. Waldner's is a vendor of Steelcase furniture, one of only two brands of institutional furniture sold in New York.  Waldner's is one of three such vendors licensed to sell Steelcase furniture in New York and has sold this product to many New York institutions, including NYPH in 2009.

## FACTUAL ALLEGATIONS

Background

12.    Lyman began working for NYPH as a Design and Construction Project Manager in July 2006, and, due to her performance, was elevated to a senior position in July of 2008.

13.    During the time Lyman worked for NYPH, she always received commendations for the work she performed, and NYPH clients specifically asked her to work on their projects.

14.    The year 2009 was a particularly successful year for Lyman professionally.  That year Lyman opened five projects, two of which were high-profile donor projects for NYPH, and three of which the client requested Lyman specifically.  The Stanton Lung Center and the Ronald O. Perelman Heart Institute were donor projects for which Lyman received many commendations for her work, including several thank you letters.

15.    Lyman suffers from severe degenerative arthritis, a disease that has caused one of her hips to degenerate over time.  This condition is extremely painful and makes it difficult for Lyman to walk, sit, or stand for long periods of time.  Lyman is currently 56 years old, but Lyman's doctor has told her that the degeneration in her hips is such that they resemble those of a 75-year-old person.

16.    Lyman's condition became significantly worse in 2009 and caused her to walk slowly and with a noticeable limp.  Lyman's colleagues regularly commented on the difficulty that she had walking and the obvious pain that she was in.  In fact, Louis Reuter ("Reuter"), the Senior Vice President of Lyman's department, commented, "that doesn't sound good" when he heard Lyman gasp in pain and sway back and forth as she walked through the

corridor in the spring or summer of 2009. Lyman's limp became increasingly pronounced as 2009 progressed, and in the summer of 2009, while Lyman was completing construction on the Ronald O. Perelman Heart Institute, there were times when Lyman's colleagues saw that she could barely walk or stand. Subsequently, Lyman's doctor advised her that she should have hip replacement surgery.

17.     Lyman's personal commitment to complete the Ronald O. Perelman Heart Institute was recognized and appreciated by the donor and upper administration. While working on the project, Lyman discussed her physical condition with LaPorta, her supervisor. Lyman told LaPorta that she would defer treatment of her hip and all vacation time until after her projects were completed to ensure that the projects, especially the Perelman project, were successfully completed for the opening celebrations planned for September 2009.

18.     In July and August of 2009, construction was nearing completion, and it was necessary for Lyman to spend many hours at the site to respond to questions, and direct the installation of "owner supplied items." At that time, Lyman was in severe pain and told LaPorta that her hip, which was put under stress by her work, was causing her a lot of pain. Lyman again told LaPorta she was delaying treatment in order to complete her projects. LaPorta seemed unsympathetic when Lyman told her this.

19.     After the Ronald O. Pearlman Heart Institute was ceremonially opened on September 14, 2009, and officially opened on September 21, 2009, Lyman told LaPorta during a meeting that she would now seek treatment to resolve her health issues.

Discrimination and Retaliation Against Lyman Because of Her Disability

20.    On September 25, 2009, Lyman met with LaPorta and Jay Waldner, a representative from Waldner's, about an NYPH project. During the meeting, LaPorta made a number of inaccurate and misleading statements regarding work on Lyman's projects.

21.    A follow-up meeting with LaPorta was held on October 6, 2009. During the meeting LaPorta asked that Lyman report on the status of an invoice Waldner's had submitted. Lyman respectfully told LaPorta that she had approved, signed and forwarded the invoice to LaPorta for her to sign. When LaPorta could not find a copy of the invoice in her "pending" folder, Lyman offered to obtain a copy of the approved invoice from accounts payable. LaPorta suddenly became angry at Lyman, ended the meeting abruptly, and left the room. Lyman then heard a door slam and LaPorta scream profanities about her to Peggy Foner ("Foner"), one of Lyman's colleagues who worked with Reuter. After the meeting, Lyman provided LaPorta with a copy of the invoice, which LaPorta had signed on October 2, 2009, four days before the October 6, 2009 meeting.

22.    In mid-October 2009, Lyman sought medical treatment and remained out of work for five days. Lyman returned to work on October 27, 2009 and sent her doctor's note to LaPorta. On October 28, 2009, LaPorta and Foner issued her a first and "final" performance warning from NYPH.

23.    LaPorta's warning contained a number of false statements. For example, LaPorta accused Lyman of being insubordinate in the October 6, 2009 meeting, and characterized the exchange with Lyman as Lyman's refusal to "cooperate and provide necessary information, demonstrating insubordinate behavior."

24.     LaPorta inaccurately stated in the warning that Lyman attended a seminar for remedial help with her interactions with colleagues. As LaPorta knew, Lyman was the only project manager who had long-term relationships with clients, and who had clients that wished to work exclusively with Lyman on their projects. Lyman was also the only project manager trusted to report construction progress and project updates to major donors. Lyman had attended the seminar to further her professional development, not as a remedial class, and later thanked LaPorta for the opportunity and support.

25.     In the October 28, 2009 performance warning, LaPorta also stated that Lyman's 2008 performance review had indicated that there were a number of serious deficiencies in her performance. The 2008 review, and those that preceded it, contradict LaPorta's characterization. Those reviews showed that Lyman's performance was ranked as satisfactory or above. Specifically, the 2008 review listed additional non-project work Lyman was selected to perform and/or develop, noted that Lyman had been placed in the position of deputy director, that Lyman had participated in a special task force on issues that the department believed required special attention, and that the department believed Lyman was well-suited to perform.

26.     Lyman responded to LaPorta's performance warning, pointing out the inaccuracies in the warning as well as her own accomplishments during 2009.

27.     When Lyman received the warning, Donna Barbaro ("Barbaro"), LaPorta's supervisor, asked Lyman to consider a transfer to NYPH's Columbia Campus, to which Lyman agreed. Barbaro later said that it would not be possible for Lyman to transfer to the Columbia Campus.

28.    In November 2009, Lyman informed LaPorta that it was likely that she would need to take a medical leave of absence during 2010. LaPorta did not respond to Lyman's notice.

29.    On or around December 3, 2009, Lyman had her hip x-rayed. The x-rays showed that her hip had badly deteriorated and was further damaged by arthritic bone spurs that had developed. Lyman's doctor advised Lyman that she should have a hip replacement sooner rather than later.

30.    On December 16, 2009, Lyman sent an e-mail to LaPorta confirming that she would need to request a medical leave of absence in 2010, and that Lyman would confirm the time of the leave with LaPorta when she knew more details.

31.    On December 16, 2009, NYPH fired Lyman, with little explanation. Lyman asked NYPH how she could officially respond and request to be reinstated, and immediately told Mark Coleman of Human Resources that it was critical that she be able to continue her health insurance in order to proceed with her medical treatment. NYPH, however, did not tell Lyman about its formal grievance process, which would have enabled her to appeal her dismissal until it was too late to appeal the dismissal. Lyman's long-term disability insurance continuation form stated that Lyman's dismissal was due to a "staff reduction."

32.    In August 2009, NYPH hired two new people to work in Lyman's department, for positions that Lyman was qualified to perform. As of December 16, 2009, the day Lyman was dismissed, neither of the two new people had completed their mandatory six month probation period. Although Lyman was qualified to do the work, NYPH did not reassign her to those positions. Since Lyman's firing, at least two, possibly three, positions for which she

is qualified have become available at NYPH.  Lyman applied for open positions on the web site but was denied the positions.

33.     After Lyman's termination, LaPorta hired outside consultants to work on a project that Lyman had developed.  In July 2009, Lyman had developed a feasibility study and phasing plan for a project that a long-time client had presented to her.  Lyman's work allowed the client to bring the project to both NYPH administration as well as to potential donors.  The project was even reviewed by Dr. Herbert Pardes, President of NYPH.  NYPH upper administration personally thanked Lyman for her work on the study, and the client requested that the project be assigned to Lyman.  The high-profile project, along with another related project, would have provided Lyman with work for two and one half to three years.

34.     LaPorta instead arranged for NYPH to pay substantial fees to the consultants LaPorta selected to work on the project.  On information and belief, the consultants are Josh Rubin, Rob King, and Jay Epstein, three men without disabilities.

35.     In January 2010, six weeks after Lyman was fired, NYPH highlighted at its annual kick-off event the completion of the Stanton Lung Center and the Ronald O. Pearlman Heart Institute as significant achievements in 2009.  Lyman's skill, talent, professional ability, and hard work made those achievements possible, and reflected favorably on the department.

Post-Termination Retaliation Against Lyman

36.     In March 2010, Lyman filed a charge of discrimination with the EEOC, alleging acts of discrimination and retaliation by NYPH.

37.     Lyman's job search began when she was dismissed from NYPH in 2009. Lyman's interviews and phone calls with prospective employers were congenial and left Lyman with the impression that the employers were potentially interested in hiring her.  However,

throughout 2010, other than her interview with Stony Brook University ("Stony Brook") after her interviews and phone calls, Lynch did not receive further contact from a single employer. On information and belief, LaPorta had advised a number of Lyman's prospective employers not to hire her.

38.     During the winter of 2009/2010, Lyman had positive communications with a New York University ("NYU") administrator who had previously been employed at NYPH. On information and belief, Lyman's contact at NYU commuted to work on the train with LaPorta. Following her initial positive contact with the NYU administrator, Lyman heard nothing further about the position. In January 2011, LaPorta was hired to a senior position at NYU.

39.     In October 2010, Lyman accepted a contract position at Stony Brook as Director of Construction and Capital Planning for the Health Science Center, with the expectation that her contract would be extended at the end of the year.

40.     Among other responsibilities, Lyman was responsible for overseeing the specification and procurement of specialized furniture needed for the Stony Brook pharmacology labs. Shortly after she was hired in October 2010, Lyman was scheduled to meet with several approved vendors, including Waldner's, a vendor that, given the specialized market for this type of furniture, NYPH had also used.

41.     On or about October 29, 2010, Lyman learned from a Stony Brook colleague that the Waldner's representative she would be meeting with was Deborah Chepegney, ("Chepegney"), who worked under Jay Waldner and who was friendly both professionally and personally with LaPorta. Lyman and Chepegney had worked together while Lyman was employed with NYPH.

42.    Lyman's Stony Brook colleague told Lyman that Chepegney had questioned the colleague as to why Stony Brook had hired Lyman given that Lyman was suing NYPH, her former employer.  At the time, Lyman had filed a confidential EEOC charge but had not commenced a formal lawsuit.  Upon information and belief, Chepegney and Waldner's learned of Lyman's EEOC charge through LaPorta, whom Chepegney and Jay Waldner saw regularly.

43.    In November 2010, Lyman met with Chepegney to discuss furniture requirements for a Stony Brook project.  Shortly after her meetings with Waldner's, Lyman's relationship with her new colleagues at Stony Brook began to deteriorate.

44.    By the late winter of 2010/2011, it became apparent that Stony Brook might not renew Lyman's contract and she began to apply for new positions with institutions throughout New York.  The health care design and construction community is small and close-knit, and employees and consultants often move between institutions or leave private industry to join institutions they have serviced in the past.  It was common knowledge in the industry that LaPorta was Lyman's supervisor at NYPH.  Lyman was able to obtain interviews in the spring of 2011 with several potential employers because of her background and accomplishments with NYPH and Stony Brook.  Those interviews, however, never culminated in a job offer.

45.    For example, during the spring of 2011, a consultant with whom Lyman worked, provided Lyman with the contact information of a senior administrator at NYU.  Lyman used the consultant as a reference and applied for an open position with NYU.   Lyman was immediately contacted for an interview by the senior administrator when the administrator received Lyman's resume.  The senior administrator told Lyman that their "senior staff" would be assembled to interview Lyman which, upon information and belief, included LaPorta.  Just

weeks after Lyman was offered an interview, NYU rescinded the offer, citing "budgetary concerns." On information and belief, LaPorta caused Lyman's application to be rejected.

46.     Lyman had similar experiences with other institutions.  Given the small size of the health care design and construction community, almost every institution to which Lyman applied had some relationship with either LaPorta or Waldner's.  On information and belief, when those institutions approached LaPorta and/or Waldner's for informal recommendations, LaPorta and/or Waldner's spoke poorly of Lyman to sabotage her application.

47.     In May 2011, Stony Brook informed Lyman that it would not renew her contract, and requested that Lyman not fulfill the remaining five months under her current contract.

### FIRST CAUSE OF ACTION

### (NYPH: ADA: DISABILITY DISCRIMINATION)

48.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 47 of this Complaint as if set forth fully herein.

49.     Plaintiff was, at all relevant times, a "qualified individual" with a "disability" within the meaning of the ADA, 42 U.S.C.A. §§ 12102 & 12111.

50.     By the acts and practices described above, NYPH discriminated against plaintiff in the terms and conditions of her employment on the basis of her disability, in violation of the ADA.

51.     NYPH acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

52.     Plaintiff is now suffering irreparable injury, monetary damages, mental anguish, and humiliation as a result of NYPH's discriminatory conduct and will continue to do so unless and until the Court grants relief.

## SECOND CAUSE OF ACTION

### (NYPH: EXECUTIVE LAW: DISABILITY DISCRIMINATION)

53.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 52 of this Complaint as if set forth fully herein.

54.     Plaintiff was, at all relevant times, a person with a "disability" within the meaning of the Executive Law, N.Y. Exec. §§ 292(21) & 292(21-e).

55.     By the acts and practices described above, NYPH discriminated against plaintiff in the terms and conditions of her employment on the basis of her disability, in violation of the Executive Law.

56.     Plaintiff is now suffering irreparable injury, monetary damages, mental anguish, and humiliation as a result of NYPH's discriminatory conduct and will continue to do so unless and until the Court grants relief.

## THIRD CAUSE OF ACTION

### (NYPH: CITY LAW: DISABILITY DISCRIMINATION)

57.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 56 of this Complaint as if set forth fully herein.

58.     Plaintiff was, at all relevant times, a person with a "disability" within the meaning of the City Law, N.Y. Admin. Code. § 8-102.

59.     By the acts and practices described above, NYPH has discriminated against plaintiff in the terms and conditions of her employment on the basis of her disability, in violation of the City Law.

60.     NYPH acted intentionally and with malice and/or reckless indifference to plaintiff's statutorily protected rights.

61.     Plaintiff is now suffering irreparable injury, monetary damages, mental anguish, and humiliation as a result of NYPH's discriminatory conduct and will continue to do so unless and until the Court grants relief.

## FOURTH CAUSE OF ACTION

### (LAPORTA AND WALDNER'S: EXECUTIVE LAW: DISABILITY DISCRIMINATION: AIDING AND ABETTING)

62.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 61 of this Complaint as if set forth fully herein.

63.     By the acts and practices described above LaPorta and Waldner's aided and abetted NYPH in discriminating against Lyman in the terms and conditions of her employment on the basis of her disability in violation of the Executive Law.

64.     Plaintiff is now suffering irreparable injury, monetary damages, mental anguish, and humiliation as a result of LaPorta and Waldner's conduct and will continue to do so unless and until the Court grants relief.

## FIFTH CAUSE OF ACTION

### (LAPORTA AND WALDNER'S: CITY LAW: DISABILITY DISCRIMINATION: AIDING AND ABETTING)

65.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 64 of this Complaint as if set forth fully herein.

66.     By the acts and practices described above, LaPorta and Waldner's aided and abetted NYPH in discriminating against Lyman in the terms and conditions of her employment on the basis of her disability in violation of the City Law.

67.     LaPorta and Waldner's acted with malice and reckless indifference to Lyman's rights under the City Law.

68.     Plaintiff is now suffering irreparable injury, monetary damages, mental anguish, and humiliation as a result of LaPorta and Waldner's conduct and will continue to do so unless and until the Court grants relief.

## SIXTH CAUSE OF ACTION

### (NYPH: ADA: RETALIATION)

69.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 68 of this Complaint as if set forth fully herein.

70.     By the acts and practices described above, NYPH retaliated against plaintiff for her opposition to discrimination on the basis of her disability and for her requests for accommodations in violation of the ADA.

71.     NYPH acted intentionally and with malice and/or reckless indifference to plaintiff's federally protected rights.

72.     Plaintiff is now suffering irreparable injury, monetary damages, mental anguish, and humiliation as a result of NYPH's retaliatory conduct and will continue to do so unless and until the Court grants relief.

310505 v2

## SEVENTH CAUSE OF ACTION

### (NYPH: EXECUTIVE LAW: RETALIATION)

73.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 72 of this Complaint as if set forth fully herein.

74.    By the acts and practices described above, NYPH retaliated against plaintiff for her opposition to discrimination on the basis of her disability and for her requests for accommodations in violation of the Executive Law.

75.    Plaintiff is now suffering irreparable injury, monetary damages, mental anguish, and humiliation as a result of NYPH's retaliatory conduct and will continue to do so unless and until the Court grants relief.

## EIGHTH CAUSE OF ACTION

### (NYPH: CITY LAW: RETALIATION)

76.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 75 of this Complaint as if set forth fully herein.

77.    By the acts and practices described above, NYPH retaliated against plaintiff for her opposition to discrimination on the basis of her disability and for her requests for accommodations in violation of the City Law.

78.    NYPH acted intentionally and with malice and/or reckless indifference to plaintiff's protected rights.

79.    Plaintiff is now suffering irreparable injury, monetary damages, mental anguish, and humiliation as a result of NYPH's retaliatory conduct and will continue to do so unless and until the Court grants relief.

## NINTH CAUSE OF ACTION

### (LAPORTA AND WALDNER'S: EXECUTIVE LAW: RETALIATION: AIDING AND ABETTING)

80.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79 of this Complaint as if set forth fully herein.

81.     By the acts and practices described above, LaPorta and Waldner's aided and abetted NYPH in retaliating against plaintiff for her opposition to discrimination on the basis of her disability and for her requests for accommodations in violation of the Executive Law.

82.     Plaintiff is now suffering irreparable injury, monetary damages, mental anguish, and humiliation as a result of LaPorta and Waldner's conduct and will continue to do so unless and until the Court grants relief.

## TENTH CAUSE OF ACTION

### (LAPORTA AND WALDNER'S: CITY LAW: RETALIATION: AIDING AND ABETTING)

83.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 82 of this Complaint as if set forth fully herein.

84.     By the acts and practices described above, LaPorta and Waldner's aided and abetted NYPH in retaliating against plaintiff for her opposition to discrimination on the basis of her disability and for her requests for accommodations in violation of the City Law.

85.     LaPorta and Waldner's acted with malice and/or reckless indifference to Lyman's statutorily protected rights.

86.     Plaintiff is now suffering irreparable injury, monetary damages, mental anguish, and humiliation as a result of LaPorta and Waldner's conduct and will continue to do so unless and until the Court grants relief.

### ELEVENTH CAUSE OF ACTION

### (IN THE ALTERNATIVE: LAPORTA AND WALDNER'S: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS)

87.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 86 of this Complaint as if set forth fully herein.

88.     LaPorta and Waldner's used dishonest, unfair, and improper means to cause Stony Brook to terminate its business relations with plaintiff and to keep plaintiff from entering into business relations with other prospective employers.

89.     LaPorta and Waldner's acted without a legitimate justification, were motivated by malice, and acted for the sole purpose of harming plaintiff.

90.     Plaintiff is now suffering irreparable injury, monetary damages, mental anguish, and humiliation as a result of LaPorta and Waldner's conduct and will continue to do so unless and until the Court grants relief.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a.      declaring that the acts and practices complained of herein are in violation of the ADA, Executive Law, City Law, and New York common law;

b.      enjoining and permanently restraining these violations of the ADA, Executive Law, City Law, and New York common law;

c.      directing NYPH to take such affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff;

d.      directing defendants to place plaintiff in the position she would have occupied but for their discriminatory, retaliatory, and tortuous conduct and to make her whole for all earnings and other benefits she would have received but for defendants' discriminatory,

retaliatory, and tortuous treatment, including, but not limited to, wages, pension, and other lost benefits;

        e.      directing defendants to pay plaintiff compensatory damages, including damages for mental anguish, humiliation, and pain and suffering and interest thereon;

        f.      directing defendants to pay plaintiff punitive damages for their intentional disregard of and/or reckless indifference to plaintiff's rights;

        g.      awarding plaintiff such interest as is allowed by law and damages to compensate for any adverse tax consequences of any award;

        h.      awarding plaintiff the costs of this action together with reasonable attorneys' fees;

        i.      awarding such other and further relief as this Court may deem necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
      June 7, 2011

                                       VLADECK, WALDMAN, ELIAS
                                       & ENGELHARD, P.C.

By: _____
                                  Rebecca J. Osborne
                                  Gregory S. Chiarello
                                  Attorneys for Plaintiff
                                  1501 Broadway, Suite 800
                                  New York, New York  10036
                                  (212) 403-7300