```
UNITED STATES DISTRICT COURT                    (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
DENISE M. LYMAN,                      :  11 Civ. 3889 (AJN) (JCF)
                                      :
             Plaintiff,               :       REPORT AND
                                      :     RECOMMENDATION
     - against -                      :
                                      :
THE NEW YORK AND PRESBYTERIAN         :
HOSPITAL and MARIA LAPORTA,           :
                                      :
             Defendants.              :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE ALISON J. NATHAN, U.S.D.J.:
```

Plaintiff Denise Lyman has filed a motion to re-open this action, which was closed following a settlement conference held before me on May 24, 2012.  The remaining defendants, The New York and Presbyterian Hospital (the "Hospital") and Maria LaPorta, oppose the motion, arguing that the parties entered into an enforceable oral agreement to settle the case at the conference. For the following reasons, I recommend that the motion be granted.

Background

Ms. Lyman filed this action against the Hospital; Maria LaPorta, the plaintiff's supervisor at the Hospital; and Waldner's Business Environments, a furniture vendor ("Waldner's"), alleging, among other things, that the defendants discriminated against her on the basis of a disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.  All claims against defendant Waldner's were dismissed with prejudice by stipulation in February 2012.

I held a settlement conference with the remaining parties on May 24, 2012.  At its conclusion, the parties had agreed on certain

1

terms to settle the action, including a payment of $59,500 to the plaintiff, a non-disparagement agreement, and a confidentiality provision.[1]  On May 30, 2012, the Honorable Alison J. Nathan, U.S.D.J., issued an order discontinuing the case "without prejudice to restoring the action" to the Court's calendar within 30 days.[2] (Order dated May 30, 2012).

Counsel for the defendants sent a draft settlement agreement to plaintiff's former counsel, Rebecca J. Osborne of Vladeck, Waldman, Elias & Engelhard, P.C. (the "Vladeck Firm"), on June 21, 2012.  (Cesaratto Cert., ¶ 7; E-Mail of Frances Many-Harris dated June 21, 2012, attached as part of Exh. E to Cohn Aff.;[3] First Draft Agreement).  Ms. Osborne returned a red-lined version of the agreement with proposed changes to defendants' counsel on August

---

[1] Although the parties agreed to keep the provisions agreed upon at the conference confidential, neither side has balked at disclosing its details, including the amount to be paid by the Hospital to the plaintiff, in publicly-available motion papers. (Draft of Confidential Settlement Agreement dated June 2012 ("First Draft Agreement"), attached as part of Exh. E to Affirmation of Frederick H. Cohn dated Oct. 28, 2012 ("Cohn Aff."), ¶ 2; Certification of Brian G. Cesaratto ("Cesaratto Cert.") dated Nov. 21, 2012, ¶ 4; Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Reopen the Case ("Def. Memo.") at 4).

[2] This deadline was extended four times at the request of the parties.  (Order dated June 25, 2012; Order dated July 11, 2012; Order dated Aug. 1, 2012; Order dated Aug. 29, 2012).

[3] The defendants ask that I disregard the Cohn Affidavit because Mr. Cohn, plaintiff's current attorney, lacks first-hand knowledge of the settlement conference and its aftermath.  (Def. Memo. at 2 n.2).  In response, the plaintiff has submitted an affirmation from plaintiff's former counsel who vouches for the accuracy of the facts included in the Cohn Affidavit. (Supplemental Affirmation of Rebecca J. Osborne dated Nov. 26, 2012 ("Osborne Aff.")).  I am therefore satisfied as to the accuracy of the Cohn Affidavit, and will consider it in my analysis.

15, 2012. (E-Mail of Rebecca Osborne dated Aug. 15, 2012, attached as part of Exh. E to Cohn Aff.; Red-lined Draft of Confidential Settlement Agreement dated Aug. 2012 ("Red-Lined Draft Agreement"), attached as part of Exh. E to Cohn Aff.).  The proposed changes included:

1.  A provision stating that the settlement amount is to be paid to Ms. Lyman for emotional distress and reported to the IRS by menas of a Form 1099  (Red-Lined Draft Agreement, ¶ 1);

2.  A provision requesting that certain identified and theretofore unidentified entities associated with the Hospital be exempted from Ms. Lyman's release of claims (Red-Lined Draft Agreement, ¶ 4(B));

3.  A provision extending the non-disparagement provision to include other Hospital employees in addition to Ms. LaPorta (Red-Lined Draft Agreement, ¶ 8);

4.  A provision extending the confidentiality provision to include Ms. LaPorta and the Hospital in addition to Ms. Lyman (Red-Lined Draft Agreement, ¶ 9); and

5.  A provision exempting Ms. Lyman from the prohibition on applying for or accepting employment with Hospital if an entity that employs Ms. Lyman is later acquired by the Hospital (Red-Lined Draft Agreement, ¶ 10).

By late August, the parties had agreed that the settlement payment would be issued to the Vladeck Firm as attorneys for Ms. Lyman, and that the payment would be reported to the IRS in a Form 1099. (Cesaratto Cert., ¶ 9; E-mail of Rebecca Osborne dated Aug. 24, 2012 ("Osborne Aug. 24 E-mail"), attached as part of Exh. B to Osborne Aff.).  However, disputes remained about a number of issues, including the Vladeck Firm's indemnification of the Hospital for any tax consequences attendant to the issuance of the payment and the Form 1099; the entities covered by the prohibition on re-employment; and the scope of the non-disparagement provision.

(E-mail of Brian Cesaratto dated Aug. 27, 2012, 2:24 PM ("First Cesaratto Aug. 27 E-mail"), attached as part of Exh. B to Osborne Aff.; E-mail of Rebecca Osborne dated Aug. 27, 2012, 3:10 PM ("Osborne Aug. 27 E-mail"), attached as part of Exh. B to Osborne Aff.; E-mail of Brian Cesaratto dated Aug. 27, 2012, 4:59 PM ("Second Cesaratto Aug. 27 E-mail"), attached as part of Exh. B to Osborne Aff.). Moreover, the Vladeck Firm was planning to seek to withdraw from representing the plaintiff. (E-mail of Brian G. Cesaratto dated Aug. 28, 2012 ("Cesaratto Aug. 28 E-mail"), attached as part of Exh. E to Cohn Aff.). On August 28, 2012, defendants' counsel sent plaintiff's counsel a draft of the settlement agreement for signature. (Cesaratto Aug. 28 E-mail). It differed from the First Draft Agreement in only two significant respects: it required payment to be made to the Vladeck Firm and reported to the IRS in a Form 1099, and it required both Ms. Lyman and the Vladeck Firm to indemnify the Hospital with regard to that payment. (Draft of Settlement Agreement dated Aug. 28, 2012 ("Second Draft Agreement"), attached as part of Exh. E to Cohn Aff., ¶¶ 1-2). Neither Ms. Lyman nor the Vladeck Firm signed the Second Draft Agreement.

On October 15, 2012, Judge Nathan approved a consent order substituting plaintiff's current attorney for Ms. Osborne and the Vladeck Firm. (Order dated Oct. 15, 2012). The present motion, which the plaintiff characterizes as pre-emptive in light of the defendants' threat to file a motion to enforce the settlement, followed shortly thereafter. (Memorandum of Law in Support of the

4

Motion to Reopen ("Pl. Memo."), at 2).

Discussion

Although this is styled a motion to re-open the case, the fundamental question is whether the parties reached an enforceable oral agreement to settle this case at the May 24, 2012 conference. I will therefore apply the body of law governing the enforceability of oral settlement agreements.  See Powell v. Omnicom, 497 F.3d 124, 128-31 (2d Cir. 2007).[4]

    A.   Governing Law

It is well-settled in the Second Circuit that "[p]arties can enter into binding oral agreements." Figueroa v. City of New York, No. 05 Civ. 9594, 2011 WL 309061, at *3 (S.D.N.Y. Feb. 1, 2011) (citing Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1985)), aff'd sub nom. Figueroa v. New York City Department of Sanitation, 475 F. App'x 365 (2d Cir. 2012).  This principle has been held to apply equally to settlement agreements. See id. ("Where the parties intend to be bound, an oral settlement of a litigation is binding even if a party later changes his or her mind." (citing Powell, 497 F.3d at 129-30)); Foster v. City of New York, No. 96 Civ. 9271, 2000 WL 145927, at *4 (S.D.N.Y. Feb. 7, 2000) ("This court must enforce a binding oral agreement, notwithstanding that plaintiff may have had a change of heart.").

---

[4] As Powell makes clear, treating this motion as one made under Rule 60(b) of the Federal Rules of Civil Procedure, as suggested by the defendants (Def. Memo. at 7), makes no difference in the analysis.  See Powell, 497 F.3d at 128-31 (reviewing district court's decision on Rule 60(b) motion under standards governing enforceability of oral settlements).

5

The plaintiff, however, asserts that under New York Civil Practice Law and Rules ("CPLR") § 2104, a settlement agreement that is not in writing is not enforceable. (Pl. Memo. at 4). If this is correct, then any oral agreement reached at the settlement conference cannot be binding.

Section 2104 provides:

> An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered. With respect to stipulations of settlement and notwithstanding the form of the stipulation of settlement, the terms of such stipulation shall be filed by the defendant with the county clerk.

CPLR § 2104. It is an open question whether this statute applies in federal court. See Figueroa, 475 F. App'x at 366 ("[W]e note that the question of whether federal or state law controls the enforceability of a settlement agreement in this context is an open one." (citing Ciaramella v. Reader's Digest Association, 131 F.3d 320, 322 n.1 (2d Cir. 1997), and Massie v. Metropolitan Museum of Art, 651 F. Supp. 2d 88, 92 (S.D.N.Y. 2009))). The Second Circuit has repeatedly deferred ruling on the question, stating that it has no practical significance because "New York law and federal common law [a]re materially indistinguishable." Powell, 497 F.3d at 129 n.1.

On one hand, some district courts have indicated that the answer depends on whether the underlying case lies within the federal court's diversity jurisdiction or its federal question jurisdiction. For example, in Figueroa, the court held that, in

6

federal question cases (like this one), federal common law determines whether an oral settlement agreement is enforceable, and therefore Section 2104 is irrelevant. See 2011 WL 309061, at *5.

On the other hand, "[a] settlement agreement is a contract that is interpreted according to general principles of contract law." Omega Engineering, Inc. v. Omega S.A., 432 F.3d 437, 443 (2d Cir. 2005). A conventional contract claim in federal court will generally be governed by state substantive law, whether jurisdiction is founded on diversity or on the court's supplemental jurisdiction in a federal question case. See, e.g., North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 43 (2d Cir. 1999) (applying state law to claim over which court exercised supplemental jurisdiction). Thus, in this case, because the defendants allege that this settlement agreement was made at a settlement conference in New York (Def. Memo. at 1), its enforceability would be governed by New York substantive law. See North Atlantic Instruments, 188 F.3d at 43.

However, that alone does not answer the question of whether Section 2104 applies. Rather, pursuant to Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), and its progeny, the solution to that problem turns on whether the statute codifies a rule of substantive or procedural law. See, e.g., Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 426-27 (1996); Gravatt v. City of New York, 54 F. Supp. 2d 233, 233-34 (S.D.N.Y. 1999). Courts in this district have not reached a consensus on this issue, either. Compare Rosenberg v. Inner City Broadcasting Corp., No. 99 Civ. 9579, 2001

WL 995349, at *2 (S.D.N.Y. Aug. 30, 2001) (applying Section 2104 as substantive New York contract law), with <u>Mone v. Park East Sports Medicine and Rehabilitation, P.C.</u>, No. 99 Civ. 4990, 2001 WL 1518263, at *4 (S.D.N.Y. Nov. 29, 2001) (disagreeing expressly with <u>Rosenberg</u> and stating, "Rule 2104 is a purely procedural rule").

    Those cases that hold Section 2104 is a procedural rule have the better argument. First, by its terms, it governs conduct in court proceedings. That is, it provides rules for "agreement[s] . . . relating to any matter <u>in</u> <u>an</u> <u>action</u>," requiring some to be in writing and allowing others to be made on the record in open court, and, further, dictates the repository for the filing of certain settlement documents. <u>See</u> CPLR § 2104 (emphasis added). Notwithstanding the fact that these requirements relate to the enforceability of certain agreements, they do not seem to me to implicate the "'the twin aims of the <u>Erie</u> rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws.'" <u>Gasperini</u>, 518 U.S. at 428 (quoting <u>Hanna v. Plumer</u>, 380 U.S. 460, 468 (1965)). In other words, application of the rule would not "have so important an effect upon the fortunes of one or both of the litigants that failure to apply it would unfairly discriminate against citizens of the forum State, or be likely to cause a plaintiff to choose the federal court." <u>Gasperini</u>, 518 U.S. at 428 (internal quotation marks and brackets omitted). It is highly unlikely, for example, that a litigant would choose a federal forum in order to take advantage of a rule that a settlement agreement -- or any other stipulation -- could be

entered into orally. Nor can I imagine how enforcing such an oral agreement would unfairly discriminate against citizens of New York. Finally, there is a practical consideration that counsels against applying Section 2104 in federal court. New York's high court has held that Section 2104 must be strictly construed. See Langreich v. Gruenbaum, 775 F. Supp. 2d 630, 637 (S.D.N.Y. 2011); Bonnette v. Long Island College Hospital, 3 N.Y.3d 281, 285-86, 785 N.Y.S.2d 738, 740-41 (2004). It would indeed be odd to hold as a matter of substantive law that, in order to be effective in a federal action, the terms of a stipulation of settlement must be filed with an officer of New York State, which is one of the statute's requirements. See CPLR § 2104 (requiring terms of stipulations of settlement to be filed with county clerk); County Town of North Hempstead v. County of Nassau, 32 Misc. 3d 809, 811, 929 N.Y.S.2d 833, 835 (N.Y. Sup. Ct. 2011) (noting that, pursuant to N.Y. County Law § 3 and N.Y. Gen. Mun. Law § 100, county is political subdivision of State).

However, I do not need to resolve this question because the outcome in this case is the same whether or not Section 2104 governs.[5]

B. Enforcement of an Oral Settlement Agreement

The ultimate question here is whether the parties intended to

---

[5] This does not mean that Section 2104 is completely irrelevant here. To the extent that it indicates a preference for written, signed settlement agreements, it figures into the analysis of the parties' intent to be bound in the absence of a writing, which is discussed below. See Clark v. Gotham Lasik, PLLC, No. 11 Civ. 1307, 2012 WL 987476, at *5 (S.D.N.Y. March 2, 2012).

be bound by an agreement in the absence of a writing. See Ciaramella, 131 F.3d at 322 ("[I]f the parties intend not to be bound until the agreement is set forth in writing and signed, they will not be bound until then."). In Winston, the Second Circuit laid out several factors to be addressed in determining this question:

> The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

777 F.2d at 80; accord Powell, 497 F.3d at 129; Abel v. Town Sports International Holdings, Inc., No. 09 Civ. 10388, 2010 WL 5347055, at *4 (S.D.N.Y. Dec. 23, 2010). "No single factor is dispositive; rather, all four factors should be considered for their bearing on the parties' intent in the context of the entire case." Langreich, 775 F. Supp. 2d at 636; see also Ciaramella, 131 F.3d at 323. Therefore, I will address each factor, although in a slightly different order.

    1.   Reservation of Right Not to be Bound

The first Winston factor focuses on whether either party reserved the right not to be bound prior to execution of a writing. Courts have recognized that a reservation of this right is entitled to great weight. See Kaczmarcysk v. Dutton, 414 F. App'x 354, 355 (2d Cir. 2011) (noting that although no single Winston factor is dispositive, "where 'there is a writing between the parties showing that [one party] did not intend to be bound . . . a court "need

look no further than the first factor."'" (alterations in original) (quoting <u>RKG Holdings, Inc. v. Simon</u>, 182 F.3d 901, 901 (2d Cir. 1999))); <u>Nieves v. Community Choice Health Plan of Westchester, Inc.</u>, No. 08 Civ. 0321, 2011 WL 5533328, at *4 (S.D.N.Y. Aug. 31, 2011).

> Although this factor is phrased in terms of 'express' reservations, courts -- including the court in <u>Winston</u> -- also analyze whether the particular facts and circumstances of the case -- such as the nature of the negotiations or the language of any draft agreements -- demonstrate an implied reservation of the right not to be bound until the execution of a written agreement.

<u>Lindner v. American Express Corp.</u>, No. 06 Civ. 3834, 2007 WL 1623119, at *6 (S.D.N.Y. June 5, 2007).

Here, there is no indication that either of the parties expressly reserved the right not to be bound at the May 24, 2012 conference.

However, there is evidence in the record that such a reservation was implied. First, each iteration of the proposed agreement expressly states that the execution of the agreement triggers the commencement of the time period for the Hospital to pay Ms. Lyman the settlement amount. (First Draft Agreement, ¶ 1; Red-Lined Draft Agreement, ¶ 1; Second Draft Agreement, ¶ 1). Execution of the agreement also was to trigger Ms. Lyman's covenant not to "assert, threaten, or commence any [c]laims" arising out of her employment at the Hospital. (First Draft Agreement, ¶ 5; Red-Lined Draft Agreement, ¶ 5; Second Draft Agreement, ¶ 5). Thus, the draft agreements provide that execution of the written agreement was a necessary prerequisite to each party's obligation

11

to provide the other with a significant benefit of the bargain. See Nieves, 2011 WL 5533328, at *5 (stating that references in written agreement to its "execution" militate in favor of finding reservation of right to be bound). Indeed, pursuant to the thirteenth paragraph of the draft settlements, Ms. Lyman is provided a period of seven days after execution of the agreement to revoke, and the agreement is not to become enforceable until that period has passed. (First Draft Agreement, ¶ 13; Red-Lined Draft Agreement, ¶ 13; Second Draft Agreement, ¶ 13). To be sure, because the agreement was not signed, the revocation period is not currently effective, see Eswarappa v. SHED Inc./Kid's Club, 685 F. Supp. 2d 229, 233 (D. Mass. 2010) (noting that revocation provision was ineffective because settlement agreement never signed); however, its inclusion and its relationship to the effective date of the proposed agreement indicates a reservation not to be bound until execution. See Kaczmarcysk, 414 F. App'x at 355 (finding that provision that agreement is effective when fully executed indicates reservation not to be bound); Ciaramella, 131 F.3d at 324 (same).

Similarly, each draft agreement provides that by "signing" the agreement, Ms. Lyman represents that she enters the agreement "voluntarily and of her own free will." (First Draft Agreement, ¶ 6; Red-Lined Draft Agreement, ¶ 6; Second Draft Agreement, ¶ 6). Thus, the "signature was meant to signify [] voluntary and informed consent to the terms and obligations of the agreement. By not signing, [the plaintiff] demonstrated that [she] withheld such

12

consent." Ciaramella, 131 F.3d at 325.

In addition, each of the draft agreements includes a merger clause stating that it is the "entire agreement between the parties" and may not be amended except in writing. (First Draft Agreement, ¶ 16; Red-Lined Draft Agreement, ¶ 16; Second Draft Agreement, ¶ 16). "The presence of such a merger clause is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." Ciaramella, 131 F.3d at 324; see also Nieves, 2011 WL 5533328, at *4 (quoting Ciaramella); Lindner, 2007 WL 1623119, at *7 (same).

Of course, the parties agreed to certain terms at the settlement conference, and the defendants point to e-mails stating that an agreement was struck. (Def. Memo. at 2). However, there is no evidence that these statements represented an intent to be bound immediately in the absence of a writing. See Ciaramella, 131 F.3d at 325. ("[N]othing in the record suggests that either attorney took th[e] statement [that the parties 'ha[d] a deal'] to be an explicit waiver of the signature requirement.").

The parties' written expressions in the draft agreements include numerous indications that any settlement agreement would be binding only upon its execution by all parties. Therefore, the first Winston factor weighs in favor of granting the plaintiff's motion.

  2. Terms Remaining for Negotiation

Winston asked "whether there was literally nothing left to negotiate" after the parties' oral agreement. Winston, 777 F.2d at

13

82 (internal quotation marks omitted).  This is not, perhaps, to be taken literally, since later cases have asked, instead, only whether the parties had agreed on all material terms.  See Powell, 497 F.3d at 130; Ciaramella, 131 F.3d at 325; Langreich, 775 F. Supp. 2d at 637.  Those cases have still recognized, however, that "even 'minor' or 'technical' changes arising from negotiations over the written language" can suffice to "show that there were points remaining to be negotiated such that the parties would not wish to be bound until they synthesized a writing satisfactory to both sides in every respect."  Powell, 497 F.3d at 130 (internal quotation marks omitted).

The defendants argue that all material terms were agreed upon at the settlement conference: (1) a payment of $59,500 to Ms. Lyman, (2) a neutral reference by the Hospital, (3) a non-disparagement clause binding the individual parties, (4) confidentiality, (5) a set and neutral response to be used if the parties are asked about the litigation, (6) a general release of all claims by the plaintiff, and (7) a provision prohibiting Ms. Lyman from reapplying for employment with the Hospital. (Cesaratto Cert., ¶¶ 4-5).

The negotiating history, however, reveals that at least one material term was not agreed upon at the settlement conference: the method by which the Hospital would pay the settlement amount, which could have significant tax consequences.  It is undisputed that the method of payment was not addressed at the settlement conference. However, it was of material importance to the plaintiff, because it

14

affected the amount of money she would recover after taxes -- and the payment was the primary obligation running from the Hospital to Ms. Lyman. Indeed, the dispute over this issue culminated in one of the few amendments to the First Draft Agreement. (First Draft Agreement, ¶ 1; Red-Lined Draft Agreement, ¶ 1; Second Draft Agreement, ¶ 1; Osborne Aug. 24 E-mail; First Cesaratto Aug. 27 E-mail). Moreover, it appears that there was not mutual assent on the extent of the non-disparagement provision -- also a key element of the agreement. (First Cesaratto Aug. 27 E-mail; Osborne Aug. 27 E-mail; Second Cesaratto Aug. 27 E-mail). Thus, it cannot be said that the settlement conference resulted in an agreement on all material terms.

### 3. Partial Performance

"[P]artial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts the performance signals, by that act, that it also understands a contract to be in effect." R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 75-76 (2d Cir. 1984).

When analyzing partial performance, courts look to whether any of the terms agreed to in settlement discussions have been performed. See, e.g., Langreich, 775 F. Supp. 2d at 636-37 (looking to substantive provisions of alleged agreement); Nieves v. Community Choice Health Plan of Westchester, Inc., No. 08 Civ. 321, 2011 WL 5531018, at *4 (S.D.N.Y. Nov. 14, 2011) ("According to the draft agreement, performance by defendants consists only of making a payment to plaintiffs. No payment was made. There has been no

meaningful act by any of the defendants indicating a partial performance of the agreement.").

The defendants argue that the exchange of drafts constitutes partial performance of the agreement, citing Jackson v. New York City Department of Education, No. 10 Civ. 9193, 2012 WL 1986593 (S.D.N.Y. June 4, 2012). (Def. Memo. at 13). In Jackson and the case on which it relies, United States v. U.S. Currency in the Sum of Six Hundred Sixty Thousand, Two Hundred Dollars ($660,200.00), More or Less, 423 F. Supp. 2d 14 (E.D.N.Y. 2006), the parties had agreed, during the settlement conference, that one party would draft the settlement agreement. See Jackson, 2012 WL 1986593, at *1; U.S. Currency, 423 F. Supp. 2d at 28-29 ("At the close of the settlement conference, as instructed by this Court and agreed to by the parties, AUSA Knuckles drafted the Stipulation and mailed it to both claimants for their execution."). Thus, the drafting, itself, became one of the agreed-upon terms. Here, there is no allegation that the parties agreed during the conference as to which would draft the agreement, so drafting cannot constitute partial performance. Moreover, other cases have rejected the notion that the exchange of drafts is relevant to the issue of performance. See Langreich, 775 F. Supp. 2d at 636-37 (rejecting argument that drafting agreement constitutes partial performance).

Here, there is no evidence that any of the substantive provisions of the agreement were performed in whole or in part. Indeed, the parties have failed to act in accord with one of its key components, the confidentiality of the settlement terms. This

16

factor therefore weighs against finding an enforceable agreement.

    4.   <u>Type of Contract Committed to Writing</u>

The Second Circuit has stated that a settlement "containing perpetual rights," such as "how future requests for employee references would be handled, prohibiting the plaintiff from reapplying for employment with the defendant, and imposing confidentiality requirements," would normally be put into writing. <u>Powell</u>, 497 F.3d at 130-31. Moreover, Section 2104, although arguably not applicable to this case, indicates a preference for committing settlement agreements to writing in order to stanch a potential "endless stream of collateral litigation over [] settlement terms" and foster "the policy concerns of certainty, judicial economy, flexibility to conduct settlement negotiations without fear of being bound by preliminary offers[,] and the prevention of fraud." <u>Bonnette</u>, 3 N.Y. 2d at 208-09, 785 N.Y.S.2d at 740-41. This factor, like the others, counsel against enforcement of the alleged oral agreement.

<u>Conclusion</u>

For these reasons, I recommend that the plaintiff's motion to re-open the case (Docket no. 44) be granted, and that this case be restored to the Court's active calendar. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the

Honorable Alison J. Nathan, Room 615, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully Submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:  New York, New York
        December 11, 2012

Copies mailed this date:

Frederick H. Cohn, Esq.
Law Office of Frederick H. Cohn
111 Broadway, Suite 1805
New York, NY 10006

Brian Cesaratto, Esq.
James S. Frank, Esq.
Epstein Becker & Green, PC
250 Park Avenue
New York, New York  10177