UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

DENISE LYMAN,

                              Plaintiff,

                v.

THE NEW YORK AND PRESBYTERIAN
HOSPITAL, *et al.*,

                         Defendants.

------------------------------------------------------X

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: _____ | |
| DATE FILED: ___July 14, 2014___ | |

11 Civ. 3889 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      In December 2009, Plaintiff Denise Lyman was terminated from her position as a project manager for major construction projects at New York and Presbyterian Hospital (the "Hospital").  Plaintiff claims that this termination amounted to discrimination against her because of her disabilities and retaliation against her based on her efforts in seeking leave to treat those disabilities; she therefore filed the instant litigation.  Defendants, the Hospital and Plaintiff's immediate supervisor there, respond that Plaintiff was terminated because of shockingly poor interpersonal dealings with supervisors, co-workers, and third parties alike; they therefore have moved for summary judgment.  For the reasons set forth below, Defendants' motion is granted in part and denied in part.

**DISCUSSION**[1]

**A.     Factual Background**

**1.     Overview**

The Hospital is an "acute care not-for-profit hospital."  (Def. 56.1(a) ¶ 2).[2]

The Hospital's Office of Facilities Development ("OFD") is responsible for all

design and construction projects at any campus or hospital affiliated with the

Hospital.  (*Id.* at ¶¶ 1, 3).  Plaintiff was employed as a project manager in OFD

from July 17, 2006, until her employment was terminated on December 16,

2009.  (*Id.* at ¶ 1).  Plaintiff's supervisor in OFD was Maria LaPorta, a Site

---

[1]     The facts are drawn from Defendants' Local Rule 56.1 statement in support of their motion for summary judgment ("Def. 56.1(a)"); Plaintiff's Local Rule 56.1 statement in opposition to Defendants' motion ("Pl. 56.1(b)"); and the exhibits attached to the Declarations of Brian Cesaratto ("Cesaratto Ex."), Maria LaPorta ("LaPorta Ex."), and Frederick Cohn ("Cohn Ex.").  References to deposition transcripts and affidavits will be styled as "[Name] Dep." or "[Name] Aff."  Exhibits introduced during a deposition and submitted as attachments to that deposition are referred to as "[Name] Dep. Ex."

For convenience, Defendants' opening brief will be referred to as "Def. Br."; Plaintiff's opposition as "Pl. Opp."; and Defendants' reply as "Def. Reply."

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent … controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[2]     In her responsive statement pursuant to Local Rule 56.1(b), Plaintiff chose to respond only to some of Defendants' Rule 56.1 assertions, and noted that "[a]ny numbered [assertion] in the [D]efendants' statement that is omitted shall be deemed admitted." (Pl. 56.1(b) 1).  Accordingly, where Plaintiff failed to respond to an assertion in Defendants' Rule 56.1 statement, the Court will cite that assertion from Defendants' statement and treat it as undisputed without any separate citation to Plaintiff's statement.  Where Plaintiff chose to respond to such an assertion only to admit it, the Court will cite to both statements.

Director, also a Defendant here.  (*Id.* at ¶ 7).  LaPorta's supervisor, in turn, was Donna Barbaro, the OFD Vice President.  (*Id.* at ¶ 8).

Project managers oversee the design and construction of Hospital projects by working with OFD staff, Hospital executives, and outside vendors and service providers.  (Def. 56.1(a) ¶¶ 11-14).  In that capacity, Plaintiff routinely interacted with co-workers such as Cindy Lawrence, OFD Interiors Manager, and with vendors such as Waldner's Business Environments, Inc. ("WBE"), and its principal, Jay Waldner.  (*Id.* at ¶¶ 17, 18, 24).

There is little of Plaintiff's employment history at the Hospital that is not disputed by the parties.[3]  At a high level of generality for purposes of overview: Plaintiff contends that, although there were certain, isolated examples of negative feedback arising from specific episodes during her employment at the Hospital, she was in general a satisfactory employee.  She also alleges that she suffered from an increasingly painful and obvious degenerative hip condition over the course of many months about which she spoke to her co-workers and supervisors, including routinely advising them that she would seek medical leave to remediate her disability after the completion of construction on the Ronald O. Perelman Heart Institute Atrium (the "Heart Atrium").  Plaintiff's firing, she contends, was done in retaliation for her desire to obtain medical leave and was provoked by her eventual request for that leave on December 16,

---

[3]     A leitmotif in this litigation is the parties' striking difference in recollections with respect to various episodes during Plaintiff's tenure at the Hospital.  Defendants have cited a number of episodes, dating back to 2007, that they claim evidence justification for Plaintiff's ultimate firing.  Plaintiff responds, as to many of these episodes, by denying that the incident took place, or by offering a contrary interpretation of its significance.

2009.  Moreover, once Plaintiff was fired, Defendants continued to retaliate against her by interfering with her subsequent employment, resulting in the buying out of her contract at Stony Brook University halfway through its year-long term.

Defendants, in contrast, allege that Plaintiff was an extremely problematic employee whose career was characterized by poor job performance and negative interactions with co-workers and vendors.  Plaintiff never appeared disabled or referred to any injury or pain, and Defendants had no idea that Plaintiff intended to seek medical leave at any time.  Plaintiff's termination was not provoked by any request for medical leave, prospective or actual, and Defendants never interfered in any way with her employment after she was fired.

### 2.   Plaintiff's Employment at the Hospital from 2006 through 2008

Plaintiff began working in July 2006.  (Def. 56.1(a) ¶ 1).  In September 2007, Defendants chronicle a complaint by an employee of the outside vendor Empire Office Furniture named Francine regarding Plaintiff's behavior.  (*Id.* at ¶ 32).  Plaintiff avers that she has no knowledge of anyone named Francine or any complaint by such a person.  (Pl. 56.1(b) ¶ 32).  Defendants further note that LaPorta told Plaintiff in October 2007, as part of a third-quarter performance review, that "outside vendor complaints ... continue" regarding Plaintiff's behavior, though Defendants identified no complaints.  (Def. 56.1(a) ¶ 34).  Plaintiff once again denies knowledge of any such complaints (Pl. 56.1(b) ¶ 34), and indeed during that third-quarter review memorialized her objection

to LaPorta's feedback on the basis that she had never been advised regarding the nature of any complaints against her (LaPorta Ex. 6).  Defendants note that Plaintiff was assigned to a development plan in 2007 targeting communications and interpersonal approach (Def. 56.1(a) ¶¶ 26, 29); Plaintiff insists that this plan was not, as Defendants characterize it, "correctional," but rather promotional (Pl. 56.1(b) ¶¶ 26-29).

Defendants submit that in November 2008, Plaintiff had a conflict with two Hospital executives, Stacey Petrower and Bernadette Meisner, regarding her interpersonal approach during a project management meeting.  (Def. 56.1(a) ¶ 36; Pl. 56.1(b) ¶ 36).  Defendants claim that LaPorta was forced to attend all future meetings with Plaintiff and these Hospital executives in order to assuage their concerns about working with Plaintiff (Def. 56.1(a) ¶ 38); Plaintiff contends that this is false, that LaPorta did not attend all future meetings with those executives, and that Plaintiff's relationship with those executives did not deteriorate as Defendants allege (Pl. 56.1(b) ¶ 38).  In January 2009, in the near aftermath of the conflict between and among Plaintiff, Petrower, and Meisner, Plaintiff received a performance review for 2008 that contained several pieces of negative feedback regarding her interpersonal approach.  (Def. 56.1(a) ¶ 39; Pl. 56.1(b) ¶ 39).

### 3.   The 2008-2009 Heart Atrium Project

The Heart Atrium, the large project on which Plaintiff had been engaged in 2008 and 2009, opened on September 14, 2009.  (Lyman Aff. ¶¶ 38, 45).  The very next day, on September 15, 2009, Plaintiff was involved in what both

sides agree was a difficult meeting with Cindy Lawrence, the Interiors Manager, and a representative from WBE.  (Def. 56.1(a) ¶¶ 42-45; Pl. 56.1(b) ¶¶ 42-45). Defendants contend that Plaintiff was tardy, extremely antagonistic to her co-worker, and disrespectful (Def. 56.1(a) ¶¶ 43-45); Plaintiff contends that this meeting has been misrepresented and embellished, and that the conflict was resolved shortly afterwards (Pl. 56.1(b) ¶¶ 43-45).

Jay Waldner, the vendor's principal, held a subsequent meeting on October 6, 2009, with LaPorta and Plaintiff.  Defendants contend that Plaintiff was insubordinate and obstructive at this meeting (Def. 56.1(a) ¶¶ 49-50), while Plaintiff insists that this is a total misrepresentation of the meeting in question, and that it was LaPorta, not Plaintiff, who was disruptive and unreasonable (Pl. 56.1(b) ¶¶ 49-50).  Waldner met once again with Plaintiff, LaPorta, and Donna Barbaro a week later on October 13.  (Def. 56.1(a) ¶ 52; Pl. 56.1(b) ¶ 52).  Defendants submit that Plaintiff was uncooperative, obstructive, and insubordinate (Def. 56.1(a) ¶ 53), while Plaintiff denies this and insists she was fully cooperative (Pl. 56.1(b) ¶ 53).

Defendants delivered to Plaintiff on October 28, 2009, a "note to file" identifying itself as a "final warning" regarding her work performance.  (Def. 56.1(a) ¶ 54; Pl. 56.1(b) ¶ 54).  Plaintiff went on a previously planned vacation on October 29, 2009, and returned on November 11.  (Def. 56.1(a) ¶¶ 59, 61; Pl. 56.1(b) ¶¶ 59, 61).  While Plaintiff was on vacation, Defendants contend that LaPorta received another complaint from a different vendor about Plaintiff's

lack of communication and interpersonal approach.  (Def. 56.1(a) ¶¶ 63, 64; Pl. 56.1(b) ¶¶ 63, 64).

Defendants contend that they began discussing terminating Plaintiff's employment "[i]n November 2009," and ultimately decided to do so on December 11, 2009.  (Def. 56.1(a) ¶¶ 66-68; Pl. 56.1(b) ¶¶ 66-68).  In the interim, on December 8, 2009, Plaintiff received a diagnosis of arthritic degeneration to her hip.  (Def. 56.1(a) ¶ 82; Pl. 56.1(b) ¶ 82).  Defendants' position is that before the moment of this diagnosis, Plaintiff had "no arthritis" at all, nor any symptoms of such a condition such as pain or decreased mobility, and that no one at the Hospital was ever aware of any such symptoms at any time.  (Def. 56.1(a) ¶¶ 83-87).  Plaintiff rejoins that she had substantial, apparent pain and mobility problems and informed her supervisors and co-workers of her disability for some months before she was fired.  (Pl. 56.1(b) ¶¶ 83-87).

On the morning of December 16, 2009, at 10:01 a.m., Plaintiff was summoned to a 10:30 a.m. meeting at which Defendants intended to fire her.  (Def. 56.1(a) ¶ 69; Pl. 56.1(b) ¶ 69).  Plaintiff subsequently sent two e-mails, at 10:05 a.m. and 10:23 a.m., advising that she would be seeking medical leave.  (Def. 56.1(a) ¶ 70; Pl. 56.1(b) ¶ 70).  Plaintiff also asserts that she sent an e-mail to the same effect at 7:23 a.m., well prior to receiving notice of the meeting (Pl. 56.1(b) ¶ 70); Defendants submit that that e-mail is a forgery (Def. Br. 21 n.16).  At the 10:30 a.m. meeting, Plaintiff was fired.  (Def. 56.1(a) ¶ 73; Pl. 56.1(b) ¶ 73).

After her employment with the Hospital was terminated, Plaintiff began working for Stony Brook University in October 2010 on a one-year contract. (Def. 56.1(a) ¶ 77; Pl. 56.1(b) ¶ 77).  In May 2011, Stony Brook decided not to renew Plaintiff's contract and bought out her remaining time.  (Def. 56.1(a) ¶ 79; Pl. 56.1(b) ¶ 79).  It is Defendants' submission that this employment decision was reached solely on the basis of Plaintiff's poor work performance and antagonistic behavior at her new position (Def. 56.1(a) ¶¶ 75, 78), while Plaintiff insists that Stony Brook's decision was motivated by details of her previous conflicts with her supervisors and co-workers at the Hospital that Defendants shared with Stony Brook as a form of post-termination retaliation (Pl. 56.1(b) ¶¶ 75, 78).

### B.    Procedural Background

Plaintiff filed the Complaint in this action against the Hospital, LaPorta, and WBE on June 7, 2011.  (Dkt. #1).[4]  Plaintiff filed an Amended Complaint on August 22, 2011, pleading claims for (i) disability discrimination against the Hospital in violation of the Americans with Disability Act, 42 U.S.C. §§ 12111-12117, 12131-12165, 12181-12189, 12201-12213 (the "ADA); the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (the "NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 to 8-131 (the

---

[4]     This matter was originally assigned to the Honorable Richard M. Berman, United States District Judge for the Southern District of New York.  Judge Berman referred it to the Honorable James C. Francis, United States Magistrate Judge for the Southern District of New York, to supervise general pretrial proceedings.  (Dkt. #11).  The case was reassigned to the Honorable Alison J. Nathan, United States District Judge for the Southern District of New York, on February 9, 2012.  (Dkt. #28).  It was then reassigned to the undersigned on June 19, 2013.  (Dkt. #62).

"NYCHRL"); (ii) aiding and abetting disability discrimination against LaPorta and WBE in violation of the NYSHRL and the NYCHRL; (iii) retaliation against the Hospital in violation of the ADA, the NYSHRL, and the NYCHRL; (iv) aiding and abetting retaliation against LaPorta and WBE in violation of the NYSHRL and the NYCHRL; and (v) tortious interference with business relations against LaPorta and WBE.  (Dkt. #16).

On February 14, 2012, Plaintiff entered a stipulation of voluntary dismissal with prejudice as to WBE.  (Dkt. #29).  On May 30, 2012, upon learning of the parties' settlement of the matter, the Court entered an Order of Discontinuance as to the remainder of the litigation.  (Dkt. #31).

The May 30 Order proved premature.  The deadline to reopen the litigation, after numerous extensions, expired on October 16, 2012 (Dkt. #41); Plaintiff moved nonetheless to reopen on November 5, 2012 (Dkt. #44-46). Defendants opposed that motion on November 21, 2012 (Dkt. #49-50), and the motion to reopen was fully submitted when Plaintiff replied on November 27, 2012 (Dkt. #51-52).  The Court referred that motion to Magistrate Judge Francis (Dkt. #53), who issued a Report & Recommendation on December 11, 2012, recommending that the Court grant Plaintiff's motion and reopen the case (Dkt. #54).  Defendants did not object and the Court adopted Judge Francis's Report & Recommendation in full on February 1, 2013, reopening the case and restoring it to the active docket.  (Dkt. #55).

Discovery ensued and, after substantial extensions, the Court set a briefing schedule for Defendants' motion for summary judgment on January 6,

2014. (Dkt. #69). Defendants moved for summary judgment on February 12, 2014. (Dkt. #73-78). Plaintiff opposed on March 19, 2014 (Dkt. #81-84), and the motion was fully submitted when Defendants replied on April 2, 2014 (Dkt. #87-88).

### A.   Applicable Law

#### 1.   Summary Judgment Generally

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on

10

an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. (1985)).

### 2.    Discrimination Claims Generally

#### a.    The ADA and the NYSHRL

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to ... discharge of employees...." 42 U.S.C. § 12112(a).  The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice ... [f]or an employer ... because of an individual's ... disability ... to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a).

Courts consider disability discrimination claims under the ADA using the traditional burden-shifting framework set out in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-03 (1973).  Under this framework, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If the plaintiff does so … the defendant [must] articulate some legitimate, non-discriminatory reason for its action.  If such a reason is provided, plaintiff … may still prevail by showing … that the employer's determination was in fact the result of" discrimination.  *Holcomb* v. *Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks and citations omitted).

"[T]o establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: [i] his employer is subject to the ADA; [ii] he was disabled within the meaning of the ADA; [iii] he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and [iv] he suffered adverse employment action because of his disability." *McMillan* v. *City of New York*, 711 F.3d 120, 125-26 (2d Cir. 2013) (quoting *Sista* v. *CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  "The same standard applies to claims brought under the NYSHRL … as well," *Nelson* v. *City of New York*, No. 11 Civ. 2732 (JPO), 2013 WL 4437224, at *6 (S.D.N.Y. Aug. 19, 2013), though the two statutes provide different definitions of the term "disability."  The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as

having such an impairment ....”  42 U.S.C. § 12102(1).  As amended by the

ADA Amendments Act of 2008,

> [a]n individual meets the requirement of “being
> regarded as having such an impairment” if the
> individual establishes that he or she has been subjected
> to an action prohibited under this chapter because of
> an actual or perceived physical or mental impairment
> whether or not the impairment limits or is perceived to
> limit a major life activity.

42 U.S.C. § 12102(3)(A).  Under the NYSHRL, in contrast, any “medically

diagnosable impairment [is] necessarily a disability” for discrimination-claim

purposes.  *Reeves* v. *Johnson Controls World Servs., Inc.*, 140 F.3d 144, 155 (2d

Cir. 1998).

### b.    The NYCHRL

The standard to be applied under the NYCHRL is slightly different.  The

statute provides in pertinent part that

> [i]t shall be an unlawful discriminatory practice ... [f]or
> an employer or an employee or agent thereof, because
> of the actual or perceived ... disability ... of any person,
> to refuse to hire or employ or to bar or to discharge from
> employment such person or to discriminate against
> such person in compensation or in terms, conditions or
> privileges of employment.

N.Y.C. Admin. Code § 8-107(1)(a).  “Disability,” in turn, is defined as “any

physical, medical, mental or psychological impairment, or a history or record of

such impairment,” *id.* § 8-102(16)(a), including “an impairment of any system

of the body; including, but not limited to ... the musculoskeletal system,” *id.*

§ 8-102(16)(b)(1).

13

The NYCHRL was long interpreted identically to the ADA and NYHRL. *Loeffler* v. *Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). There can be no question, however, after the New York City Council passed the Local Civil Rights Restoration Act of 2005, that the City law is "not coextensive" with analogous state and federal laws, *Kreisler* v. *Second Ave. Diner Corp.*, No. 10 Civ. 7592 (RJS), 2012 WL 3961304, at *14 (S.D.N.Y. Sept. 11, 2012), and that "'the provisions of [the NYCHRL] are to be construed independently from similar or identical provisions of New York state or federal statutes,'" *Mihalik* v. *Credit Agricole Cheuvreux N. Am.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting Restoration Act § 1).

"[C]ourts have continued to employ the familiar burden-shifting analysis of *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973)" to claims brought under the NYCHRL. *Kerman-Mastour* v. *Fin. Indus. Regulatory Auth., Inc.*, 814 F. Supp. 2d 355, 366 (S.D.N.Y. 2011) (internal citations omitted); *but cf. Mihalik*, 715 F.3d at 110 n.8 ("It is unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims."). The salient difference is that "[w]hile the *McDonnell Douglas* burden-shifting framework still applies, at the final step the plaintiff has a 'lesser burden of raising an issue as to whether the action was motivated at least in part by discrimination or, stated otherwise, was more likely than not based in whole or in part on discrimination.'" *White* v. *Pacifica Found.*, No. 11 Civ. 2192 (PGG), 2013 WL 5288851, at *12 (S.D.N.Y. Sept. 19, 2013) (quoting *Melman* v.

*Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 41 (1st Dep't 2012)).  As the Second

Circuit has explained it,

> the plaintiff need only show that her employer treated
> her less well, at least in part for a discriminatory reason.
> The employer may present evidence of its legitimate,
> non-discriminatory motives to show the conduct was
> not caused by discrimination, but it is entitled to
> summary judgment on this basis only if the record
> establishes as a matter of law that discrimination
> played *no* role in its actions.

*Mihalik*, 715 F.3d at 110 (alteration and internal quotation marks omitted)

(emphasis in *Mihalik*).

### 3.    Summary Judgment in Employment Discrimination Cases

The Second Circuit "has repeatedly emphasized the need for caution

about granting summary judgment to an employer in a discrimination case

where … the merits turn on a dispute as to the employer's intent."  *Gorzynski*

v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (internal quotation

marks and citation omitted).  "Because direct evidence of an employer's

discriminatory intent will rarely be found, affidavits and depositions must be

carefully scrutinized for circumstantial proof which, if believed, would show

discrimination."  *Schwapp* v. *Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)

(internal quotation marks and citations omitted).  "Even in the discrimination

context, however, a plaintiff must provide more than conclusory allegations to

resist a motion for summary judgment, and show more than 'some

metaphysical doubt as to the material facts.'"  *Gorzynski*, 596 F.3d at 101

(internal citations omitted).

15

The Court will address Defendants' motion with respect to each of Plaintiff's claims below.  Because there are issues of fact inappropriate for resolution at this stage, summary judgment is largely unavailable.

**B.    Analysis**

**1.    Identifying Plaintiff's Claims**

The nature of Plaintiff's discrimination and retaliation claims, and the distinctions between them, is not at all clear.  This confusion is exacerbated by the fact that Plaintiff devotes only three pages in her brief to legal argument, with little substance offered in opposition to Defendants' motion.  That said, Plaintiff's brief clarifies that her disability-discrimination claims are based on the argument "that [Plaintiff] was entitled to a reasonable accommodation when she could no longer perform her job effectively and that when she sought to remediate her medical problem, she was terminated because of it."  (Pl. Opp. 11).  In other words, Plaintiff expressly limits her disability-discrimination claims to address her termination in response to her application for medical leave and no other conduct.

Plaintiff's retaliation claims, in turn, appear intended to address both her termination itself, as well as Plaintiff's allegations regarding post-termination retaliation with respect to other employers.  In this regard, however, Plaintiff's opposition brief contains no argument regarding her claims of post-termination retaliation, and her otherwise lengthy Affidavit addresses it in only two paragraphs.  (Lyman Aff. ¶¶ 26-27).  The Court will nonetheless treat these

claims as distinct arguments for Defendants' liability and address them separately below.

### 2. Summary Judgment Is Denied as to Plaintiff's Disability Discrimination Claims

#### a. Material Fact Issues Exist Concerning Plaintiff's Prima Facie Case of Disability Discrimination

Defendants argue that Plaintiff has not shown that she was disabled or that she experienced adverse employment action because of any disability.[5] Defendants are wrong; issues of material fact remain on both counts.

#### i. Whether Plaintiff Was Disabled

Defendants argue that Plaintiff has not shown that she was disabled while employed at the Hospital. (Def. Br. 13). They argue that she received no diagnosis of disability during her employment; that she underwent no treatment and made no medical appointments to address any alleged pain or disability; that her testimony indicates a lack of disability; and that photographs from a vacation she took in October 2009 demonstrate a lack of disability. (*Id.*). Though not entirely incorrect, Defendants do no more than illustrate that there are conflicting accounts of Plaintiff's disability. "For the Defendant[s'] motion for summary judgment to be granted, there must be no questions about the material facts of the prima facie case." *Rajcoomar* v. *TJX Companies, Inc.*, 319 F. Supp. 2d 430, 434 (S.D.N.Y. 2004).

---

[5]     Defendants do not appear to contest the other elements of Plaintiff's prima facie case.

To begin with, Defendants point to a series of photographs taken on a vacation to Egypt in October 2009.  (Cesaratto Ex. E).  Of course, that Plaintiff traveled abroad does not itself establish whether she was disabled.  Defendants argue more particularly that these pictures, "either of [Plaintiff] or taken by [Plaintiff] … show no impairment" in October 2009, two months prior to her firing.  (Def. Reply 9 (emphasis omitted)).  Yet Defendants' reliance on these photographs is puzzling.  Defendants refer to images they claim illustrate that Plaintiff had no disability, yet they provide no specific reference to any individual picture beyond vague descriptions.  The pictures themselves bear no individual identification or Bates numbers that would permit such specific reference in the first place.  Moreover, Defendants failed to identify for the Court which of the several individuals depicted in the photographs is the Plaintiff.  Defendants and their counsel are no doubt familiar with Plaintiff's appearance and so can identify her with ease in these images; the Court, obviously, is not and cannot.  In consequence, the photographs, far from proving Defendants' case, are of no use and the Court will disregard them.

Defendants fare only marginally better with the other evidence they cite.  They claim, for instance, that Plaintiff admitted in her deposition that she was not disabled.  It is true that Plaintiff testified she received no diagnosis of damage to her hip before December 2009.  (Lyman Dep. 30:5-15).  Plaintiff also testified that, although she spoke to physicians about pain management, she never sought a private consultation regarding her hip before the end of 2009, and was not before that time recommended treatment plans or prescribed pain

18

medications.  (*Id.* at 34:20-35:25).  Defendants then point to medical records

bolstering their argument: one reflecting that Plaintiff reported to her

physicians that she exercised two or three times weekly (Lyman Dep. Ex. 12 at

1), and another of an October 2009 consultation with an ophthalmologist

indicating "[n]o muscle or joint pain, "[n]o restriction of motion," and an

"intact" gait (Cesaratto Ex. F).  Finally, Defendants insist that there is a "total

absence of medical proof" of any disability of Plaintiff's (Def. Br. 14), and

correctly point out that disability-discrimination plaintiffs have routinely been

required by courts in the Second Circuit to demonstrate their disabled status

by relying on medical evidence.  *See, e.g., Baerga* v. *Hosp. For Special Surgery*,

No. 97 Civ. 0230 (DAB), 2003 WL 22251294, at *6 (S.D.N.Y. Sept. 30, 2003)

(collecting cases).[6]

      Yet there is medical proof that Plaintiff, while employed by the Hospital,

suffered from a degenerative condition of her hip.  On December 8, 2009,

Lyman received a diagnosis of "[h]ypertrophic degenerative changes of the right

hip joint." (Lyman Dep. Ex. 11).  Whether the timing of this diagnosis has

analytical implications for other elements of Plaintiff's claims is a separate

question; as relevant here, Defendants simply cannot claim that there is no

proof that Plaintiff suffered from a medically diagnosable physical impairment

during her employment, as required by the NYSHRL.  This medical evidence

does not indicate whether and to what extent this impairment "substantially

---

[6]      Defendants also might fairly cite the testimony of several deposed Hospital employees
who testified that they never saw Plaintiff limp or demonstrate any degree of pain or
disability at all.  (LaPorta Dep. 22:12-17; Foner Dep. 10:11-15; Barbaro Dep. 14:9-15).

limit[ed]" a major life activity, as required under the ADA; however, Plaintiff has provided evidence strongly indicating, though not proving, that her ability to stand and walk was limited by the degeneration of her hip.  For example, internal Hospital medical records reflect back and/or hip pain during appointments in February 2007, February 2008, and March 2009.  (Cohn Ex. 16 at 9, 13, 18).  Defendants are correct to point out that these records do not unambiguously indicate that her pain derived exclusively from her hip (Def. Reply 8 n.10); but Defendants' argument is merely another way of saying that there is an issue of material fact as to the import of these records for Plaintiff's disabled status.  Much less ambiguous is a record of a follow-up evaluation with Park Avenue Medical Professionals on November 24, 2009, at which Plaintiff was examined relating to hip pain so severe that it awoke her from sleep.  (Cohn Ex. 15 at 4).

Plaintiff's deposition testimony bolsters her position: she testified that in 2008 and 2009, her hip had grown so painful that she "wouldn't walk" (Lyman Dep. 177:19-20), and that the pain was sufficiently "unbearable" that she "couldn't stand on [her] leg or sit comfortably ... or walk" (*id.* at 216:23-25).  So does the deposition testimony of a Hospital administrative assistant, who testified that she saw Plaintiff "pulling one leg" in the hallway (Foreman Dep. 12:22),[7] and the affidavit of, among others, a construction contractor who

---

[7]   Foreman testified that "[w]hen [Plaintiff] first started working, she got off the elevator, I noticed one leg, she was like pulling one leg...." (Foremen Dep. 12:20-23).  Defendants interpret Foreman's reference to "[w]hen [Plaintiff] first started working" as indicating the beginning of Plaintiff's employment at the Hospital in July 2006.  (Def. Reply 9). This is one possible reading of Foreman's remark, though neither the only such reading nor the most natural; it seems at least as likely that Foreman was referring to the

averred that he observed Plaintiff in "evident pain" whenever she stood at a construction site for "any appreciable length of time" in July 2009, five months before Plaintiff's termination (Fiorentino Aff. 2, Cohn Ex. 14 at 12-13).[8]

While it is by no means unquestionably clear that Plaintiff was disabled during her employment at the Hospital, her diagnosis itself, internal Hospital medical records, and records of Plaintiff's private medical consultations, corroborated by Plaintiff's own testimony and the affidavit and deposition testimony of others, provide sufficient evidence for a jury to conclude that she has satisfied this element of her prima facie case.

---

beginning of a particular work day, as opposed to the beginning of Plaintiff's employment. Of course, given the arguable ambiguity in Foreman's remark, the Court cannot conclude that Foreman necessarily meant one or the other. This is yet another reason why material disputes exist as to Plaintiff's disabled status and, as discussed below, whether the Hospital was fairly on notice regarding any disability she experienced.

[8]   Plaintiff also supports her opposition to Defendants' motion with the affidavit of David Wilklow, a colleague of Plaintiff's at the Hospital. (Wilklow Aff., Cohn Ex. 14 at 8-9). Defendants argue in reply that Plaintiff may not rely on this affidavit because she did not identify Wilklow as a witness in her original Rule 26(a) Initial Disclosures, in the revised witness list she provided after the first day of her deposition, or in her response to Defendants' interrogatory request for the name of any colleague who regularly commented on her difficulty walking and obvious pain. (Def. Reply 10 n.13). Consulting those materials, the Court agrees that Plaintiff never informed Defendants that Wilklow's testimony might be relevant to their motion until she filed his affidavit in opposition. (Def. Reply Ex. B, C, D). By the same token, Defendants did interrogate Plaintiff at some length during her deposition about an e-mail she had sent to Wilklow in October 2009. (Lyman Dep. 115:10-117:16). Unlike in *Fleming* v. *Verizon New York, Inc.*, No. 03 Civ. 5639 (WHP), 2006 WL 2709766, at *8-9 (S.D.N.Y. Sept. 22, 2006), this is not a case in which Plaintiff "mentioned" Wilklow's name in her deposition; rather, his name was introduced by Defendants, who had found important reference to him in discovery materials and devoted a portion of their examination to questions regarding Plaintiff's communications with him. Thus, though Plaintiff unquestionably erred in not disclosing Wilklow's name when appropriate, whether this affidavit may be introduced here is a closer question than Defendants suggest. However, as Defendants' motion must be denied even without reference to Wilklow's testimony, deciding this question is unnecessary at this time. Should Plaintiff seek to rely on Wilklow at trial, Defendants will be offered the opportunity to depose him if they choose.

> ii.   **Whether Plaintiff's Termination Was Motivated by Her Disability**

Before discussing the evidence on the causal prong, the Court must first examine the proper legal standard.  To establish the "because of" element of her case, Plaintiff argues, she need only show that her disability was "in any way a motivating factor in the decision" to terminate her employment.  (Pl. Opp. 13).  This so-called "mixed-motives" standard of causation is, it has been established, a correct statement of a plaintiff's burden under the NYCHRL. *Melman* v. *Montefiore Med. Ctr.*, 98 A.D.3d 107, 127 (1st Dep't 2012).

Whether the same standard applies under the ADA and the NYSHRL is an open question.[9]  The Second Circuit ruled in *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 337 (2d Cir. 2000), that "a plaintiff need not demonstrate that disability was the sole cause of the adverse employment action"; instead, "he must show only that disability played a motivating role in the decision." Since that time, however, the Supreme Court has held that, while the mixed-motives standard applies to claims of discrimination brought under Title VII, that standard is not available to plaintiffs suing under the Age Discrimination in Employment Act.  *Gross* v. *FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).  The ADEA, the Court explained, is simply a different statute; while Title VII was expressly amended by Congress to impose liability when an

---

[9]     Because "the Second Circuit has traditionally applied the same analytic framework and causation standard to claims brought under [federal law] … and the New York State Human Rights Law," the standard applicable under the NYSHRL presumably suffers from the same lack of clarity.  *Weiss* v. *JPMorgan Chase & Co.*, No. 06 Civ. 4402 (DLC), 2010 WL 114248, at *2 (S.D.N.Y. Jan. 13, 2010).

improper consideration was "'a motivating factor'" for an adverse employment action, the ADEA imposes liability only when such an action was "because of" a protected characteristic.  *Id.* at 175-76 (quoting 42 U.S.C. § 2000e-2(m)).  The ADEA's language thus requires plaintiffs to prove that discrimination was the "but-for cause of the employer's adverse action."  *Id.* at 176 (internal quotation marks omitted).

The ADA, like the ADEA and unlike Title VII, also refers to adverse employment actions undertaken "because of" discrimination.  The Second Circuit has acknowledged that "it is questionable whether [ADA] discrimination claims can proceed on a mixed-motive theory" after *Gross.  Bolmer* v. *Oliveira*, 594 F.3d 134, 148 (2d Cir. 2010).  Some district courts in this Circuit, reading the writing on the wall, have concluded that *Parker* cannot endure in light of *Gross* and that the ADA, like the ADEA, requires a plaintiff to show but-for causation.  *See, e.g.*, *Saviano* v. *Town of Westport*, No. 04 Civ. 522 (RNC), 2011 WL 4561184, at *6 (D. Conn. Sept. 30, 2011).  Others have preferred to treat *Parker* as binding absent a conclusive pronouncement by the Second Circuit or the Supreme Court, and have continued to apply mixed-motives analysis under the ADA.  *See, e.g.*, *Doe* v. *Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 343 n.40 (S.D.N.Y. 2010).  Several circuits other than the Second Circuit have already taken the step *Gross* seems to presage and applied the but-for standard to ADA claims.  *See Widomski* v. *State Univ. of New York (SUNY) at Orange*, 933 F. Supp. 2d 534, 546 n.9 (S.D.N.Y. 2013) (collecting cases).

However, even under the traditional *McDonnell Douglas* analysis, Plaintiff can satisfy her burden of showing that, on her version of the facts, her disability motivated her discharge. As explained below, she can also adduce facts that, if true, would show Defendants' rebuttal argument to be a pretext for discrimination. Accordingly, the Court need not resolve the question of the proper ADA standard and so will not.

With respect to the evidence, Defendants argue that Plaintiff, even if indeed disabled, cannot show her termination was because of her disability. (Def. Br. 13). Defendants' argument on this score seems to turn on two points: (i) Defendants did not know Plaintiff was disabled; and (ii) Defendants decided to terminate Plaintiff's employment before being notified of her disability. Fact questions remain on both counts and so summary judgment is denied.

It is true that, as the Supreme Court has explained, it cannot "be said that [an employer] was motivated to [discriminate against an employee] because of his disability if [the employer] was entirely unaware that such a disability existed." *Raytheon Co.* v. *Hernandez*, 540 U.S. 44, 54 n.7 (2003); *see also Pacenza* v. *IBM Corp.*, 363 F. App'x 128, 130-31 (2d Cir. 2010) (summary order). But whether Plaintiff alerted Defendants as to her increasing pain and immobility and the attendant need for medical intervention is disputed and cannot be resolved here. Defendants contend that no employee of the Hospital was aware that Plaintiff had any medical problems of any kind. (Def. 56.1(a) ¶ 72). Plaintiff insists that her limp and pain were obvious to all and a frequent topic of conversation for some time prior to her termination, and that

24

she told her supervisor LaPorta on multiple occasions that she would need to seek medical leave to address her problem.  (Pl. 56.1(b) ¶ 72 (citing, among other things, Lyman Aff. ¶¶ 40-41); *see also* Lyman Aff. ¶¶ 43-45).  If the jury believes Plaintiff, she will have no trouble establishing that Defendants were aware of her disability; if it believes Defendants, Plaintiff will lose on this basis alone.  Given these diametrically opposing accounts, summary judgment is unavailable.

Defendants alternatively argue that they were not on notice of Plaintiff's disability because she could not have disclosed a diagnosis of arthritis to them before she received that diagnosis on December 8, 2009.  (Def. Br. 18).  To no avail: there is no requirement of medical evidence associated with the necessity of an employer's awareness of the disability at issue.  Defendants' argument on this point is, at its core, a restatement of their argument that Plaintiff was not disabled during her employment; that is, as explained above, a separate topic and one that cannot be answered at this stage.

Defendants also maintain that they had reached the decision to terminate Plaintiff's employment on December 11, 2009, days before she was actually fired on December 16, and so their decision could not have been "because of" her request for medical leave.  Moreover, they contend that Plaintiff did not even send an e-mail making that request until after she had received the ominous request at 10:01 a.m. on December 16 to attend a meeting at which she would be fired, whereupon she sent two e-mails in short succession at 10:05 a.m. and 10:23 a.m.  Plaintiff tells a meaningfully different

25

story.  First of all, she insists that she discussed her disability with her supervisor LaPorta and other employees of the Hospital many times over a long period, and repeatedly advised that she would need to seek a medical leave to address her hip condition.   (Pl. 56.1(b) ¶ 72).  What is more, she insists that she first e-mailed Defendants at 7:23 a.m. on December 16 to request medical leave, and that the e-mails sent at 10:05 a.m. and 10:23 a.m. were both merely follow-up messages.  (Lyman Aff. ¶ 78).

The authenticity of this 7:23 a.m. e-mail is disputed.  It was not produced during discovery and does not bear Bates stamps.  (Cohn Ex. 25 at 1).  When it was introduced during the deposition of Donna Barbaro, counsel for Defendants inquired as to the origin of the e-mail and why it was not Bates-stamped; Plaintiff had no good answer.  (Barbaro Dep. 39:9-40:9).[10]  Based on these issues, Defendants refer to the document as "a concocted effort to fabricate" evidence in support of her claims.  (Def. Br. 21 n.16).  This is a serious charge and one that Defendants do not substantiate.  There are certainly reasons for concern regarding the 7:23 a.m. e-mail; not only was it confessedly not produced during paper discovery, but it also appears to be identical, character by character, to the undisputed e-mail Plaintiff sent to the same recipients at the suggestively similar time of 10:23 a.m. that same day.  (*Compare* Cohn Ex. 25 at 1, *with id.* at 4).  But there is no basis for the Court

---

[10]      In part, as Plaintiff's counsel noted at that time, this is attributable to Plaintiff's change in counsel during the course of this litigation, the transfer of the file for this matter between her former and current counsel, and the resulting lack of familiarity on the part of current counsel with some details of document discovery.

to conclude that the e-mail was actually forged.  Nor can Defendants contend, as with the affidavit of David Wilklow, that they were "essentially sandbagged" by this document (Def. Reply 10 n.13 (internal quotation marks omitted)); on the contrary, Defendants were fully advised of the document's existence during the Barbaro deposition and affirmatively attacked the validity of the document in their brief in support of the pending motion.

Alternatively, Defendants argue that because they made the decision to terminate Plaintiff's employment before she reported her diagnosis, their decision could not have been motivated by her disability.  (Def. Br. 17).  First, Defendants have no contemporaneous corroboration for their claimed chronology regarding their decision to terminate Plaintiff's employment; the only document reflecting that sequence of events was created after the fact on the day Plaintiff was fired.  Second and worse, Defendants are merely arguing again in a slightly different guise that Plaintiff's formal diagnosis was the first occasion on which Defendants could fairly be found to have notice of her disability.  But as Plaintiff tells it, she struggled to stand or walk, and made frequent exclamations of pain as she did, throughout 2008 and 2009.  Further, she testified that she discussed her condition with her supervisor LaPorta and others many times over a long period.  Irrespective of Plaintiff's diagnosis, if these claims are true, Defendants could not contend that they did not at least perceive Plaintiff to suffer from a disability that would, Plaintiff claims she told them herself, require a significant future accommodation in the form of extended medical leave.  It is for the jury to decide whether that is so.

27

Finally, Defendants seem to argue that they had separate, nondiscriminatory rationales to terminate Plaintiff and that these justifications existed independent of any information they possessed about Plaintiff's disability.  (Def. Br. 18).  But the Second Circuit has repeatedly cautioned that courts should not collapse the first and third steps in the *McDonnell Douglas* framework so as "to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision."  *Gregory* v. *Daly*, 243 F.3d 687, 696 (2d Cir. 2001); *see also Aksamit* v. *772 Park Ave. Corp.*, No. 00 Civ. 5520 (RCC), 2003 WL 22283813, at *4 (S.D.N.Y. Oct. 2, 2003) (observing that courts should not "conflate plaintiffs' minimal burden at the prima facie stage with their burden to rebut defendants' legitimate nondiscriminatory explanations"), *aff'd*, 128 F. App'x 204 (2d Cir. 2005) (summary order).  Whether Plaintiff can successfully evade summary judgment by calling into question Defendants' ostensibly nondiscriminatory rationale for her termination is a different question from whether she can make out her prima facie case.  The former is addressed below; the latter she has done.

A jury could find that Plaintiff had indeed notified Defendants many times that she was disabled and planned to seek medical leave; that Defendants are deliberately misrepresenting the past when they claim total ignorance of her disability or plans to seek medical leave; and that Defendants had in turn planned to fire her to avoid supporting that leave.  A jury could also find that the 7:23 a.m. e-mail is authentic and that Plaintiff formally

requested medical leave early in the morning on the day her employment was terminated.  In the retaliation context, which is directly analogous here given Plaintiff's exclusive reliance on her request for medical leave as the basis for her discrimination claims, the Second Circuit has held that "a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation." *Treglia* v. *Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002).  Jurors could also reasonably find that Defendants' insistence that the 7:23 a.m. e-mail is a fabrication is a further indication of their efforts to conceal that Plaintiff's firing was "because of" her application for medical leave.  In short, "[t]aking all facts in a light most favorable to [Plaintiff], as this Court is required to do with respect to motions for summary judgment, [Plaintiff has] established a prima facie case of discrimination." *Rajcoomar*, 319 F. Supp. 2d at 436.

### b. Defendants Have Shown Legitimate, Nondiscriminatory Reasons for Firing Plaintiff

Defendants have, in turn, satisfied their own burden of demonstrating a nondiscriminatory basis for terminating Plaintiff's employment.  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves* v. *Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr.* v. *Hicks*, 509 U.S. 502, 509 (1993)).  Defendants have more than made a case that Plaintiff was a problem employee whose firing was motivated solely by her inappropriate behavior.

29

As Defendants tell the story, Plaintiff began receiving negative commentary on her interpersonal skills and management style as early as her 2006 performance review, in which she was exhorted to "continue to be mindful of team aspect[] as an essential part of project Management, for both internal co-workers/clients and external consultants/vendors." (Def. 56.1(a) ¶ 28; Pl. 56.1(b) ¶ 28) (internal quotation marks omitted). Defendants contend Plaintiff was issued a remedial development plan in May 2007, termed the Talent Development Plan, that referred to negative feedback she had received from users regarding her communication and counseled her to improve her communication through training courses and required reading. (LaPorta Dep. Ex. J).

Complaints continued, including in September 2007 from one Francine, an employee of Empire Office Furniture. (LaPorta Ex. 5). A mid-year review in 2007 advised Plaintiff that she should focus on improving the tone she used when encountering project obstacles. (*Id.* at Ex. 6). A memorandum from November 2008 reflects complaints from two hospital executives, Bernadette Meisner and Stacey Petrower, that the tone used by Plaintiff during project meetings was inappropriate (*id.* at Ex. 7); LaPorta and Barbaro swear in their affidavits that to resolve these complaints, LaPorta was forced to attend all meetings that Plaintiff had with those executives thereafter (LaPorta Aff. ¶ 13; Barbaro Aff. ¶ 15). Plaintiff's 2008 review indicates that there were complaints during the past year from team members about her interpersonal approach. (LaPorta Ex. 8 at 4, 9).

30

Defendants recount that these criticisms reached a height in the fall of 2009, when the record suddenly becomes thick with documents memorializing personal conflicts between Lyman and various co-workers and vendors.  For example, an e-mail from September 2009 reflects Cindy Lawrence's account of an extremely antagonistic meeting involving Plaintiff, co-workers, and vendor Jay Waldner.  (LaPorta Ex. 10).  An e-mail from Waldner reflects similar circumstances and indicates that one of his employees refused to work with Plaintiff on future projects (*id.* at Ex. 11), as does an e-mail exchange between that employee and Plaintiff's supervisor LaPorta (*id.* at Ex. 12).  Waldner wrote LaPorta again the following month with complaints about Plaintiff's management of open invoices and her interpersonal approaches to Waldner, his employee, and Hospital staff.  (*Id.* at Ex. 13).  An evaluation by Petrower contains substantial negative commentary about Plaintiff's interpersonal approach.  (*Id.* at Ex. 14).  A "memo to file" from October 13, 2009, recounts another antagonistic meeting involving Waldner, LaPorta, Barbaro, and Plaintiff, including Plaintiff "being unprofessional and disrespectful and not a team player."  (*Id.* at Ex. 15).

Defendants point to a "note to file" delivered to Plaintiff on October 28, 2009, referring to itself as a "final warning for [Plaintiff's] continued inappropriate behavior" and threatening "further discipline, up to and including termination" if Plaintiff did not demonstrate "[i]mmediate and consistent improvement regarding her "behavior towards vendors, customers and [her] co-workers."  (LaPorta Ex. 16).  E-mails from Waldner on October 29

and 30 reflect an ongoing billing dispute regarding unpaid invoices that Waldner escalated to Plaintiff's supervisor LaPorta.  (*Id.* at Ex. 17, 18, 19). Defendants once again delivered the "note to file" identifying itself as a "final warning" to Plaintiff on November 11, 2009.  (*Id.* at Ex. 20).

Motivated by this history of conflict and inappropriate performance, Defendants contend, based on yet another "note to file" composed on December 16, 2009, that they made the final decision to terminate Plaintiff's employment on December 11, setting the date for her termination on December 16. Considered in its totality, this account of Plaintiff's employment more than satisfies Defendants' obligation to show a legitimate rationale for her discharge.

### c.    Plaintiff Has Adequately Rebutted Defendants' Ostensibly Nondiscriminatory Rationale

Defendants having done so, the burden returns to Plaintiff to demonstrate "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Texas Dep't of Cmty. Affairs* v. *Burdine*, 450 U.S. 248, 253 (1981).  "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Holcomb*, 521 F.3d at 138 (quoting *Burdine*, 450 U.S. at 253).  Even if a plaintiff succeeds in showing pretext, a court "must examine the entire record to determine if plaintiffs meet their ultimate burden of persuading the fact-finder ... that defendants intentionally discriminated against them on the basis of their race."  *Lizardo* v. *Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir. 2001).

Plaintiffs may "'establish pretext and thereby successfully oppose summary judgment, ... by demonstrat[ing] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action.'" *Ramos* v. *Marriott Int'l, Inc.*, 134 F. Supp. 2d 328, 343 (S.D.N.Y. 2001) (quoting *Cruse* v. *G&J USA Publishing*, 96 F. Supp. 2d 320, 329 (S.D.N.Y. 2000)) (alterations in *Ramos*). "[I]n many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive." *Holcomb*, 521 F.3d at 141 (citing *Reeves*, 530 U.S. at 147).

Nonetheless, "such evidence of pretext is 'simply one form of circumstantial evidence that is probative of intentional discrimination,' and — when combined with a prima facie case — may not be enough to withstand a defendant's motion for summary judgment." *Tarshis* v. *Riese Org.*, 195 F. Supp. 2d 518, 525 (S.D.N.Y. 2002) (quoting *Reeves*, 530 U.S. at 147), *aff'd*, 66 F. App'x 238 (2d Cir. 2003) (summary order). Whether a plaintiff meets her burden "will depend on a number of factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that [the] employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Id.* (quoting *Reeves*, 530 U.S. at 148-49).

Plaintiff has indicated triable issues of fact regarding whether Defendants' putative rationale is a pretext for discrimination. A jury could conclude that the above legitimate rationale was pretextual and that Plaintiff's

33

request for medical leave was the true basis for Defendants' decision to terminate her employment.  Thus summary judgment is denied.

### i.        Plaintiff Has Identified Evidence of Pretext

To be clear, whether Plaintiff has met her burden of showing pretext, and thereby staved off summary judgment as to her discrimination claim, is a very close question.  The evidence of Plaintiff's history of personality conflicts with other individuals at the Hospital and with certain outside vendors is extensive. Plaintiff insists, however, that older documentary evidence has been reinterpreted to reflect a far more negative assessment of her performance than was actually the case at the time those documents were created, and that Defendants spent the period from September to December 2009 papering the record to justify firing Plaintiff in anticipation of her request for medical leave. By a narrow margin, Plaintiff succeeds in this argument for the purposes of defeating Defendants' motion: a jury could, on the basis of the arguments she adduces here, conclude that Defendants' ostensibly neutral basis for terminating her employment was pretextual.

### (a)        Records from 2007 and 2008

First, Plaintiff casts doubt on numerous incidents Defendants allege illustrate her routine inappropriate behavior throughout 2007 and 2008.  As discussed in the Background section above, Defendants point to a complaint from one Francine at Empire Furniture regarding Plaintiff; Plaintiff swears that she never met or worked with a Francine and was never informed of any complaint by any such person.  (Lyman Aff. ¶ 70).  Plaintiff also avers that the

memorandum reflecting complaints by Hospital executives Stacey Petrower and Bernadette Meisner has been mischaracterized.  (Lyman Aff. ¶ 51).  In particular, Plaintiff insists that Barbaro and LaPorta both flatly lie in their affidavits about this incident and that, contrary to her testimony, LaPorta did not attend future project meetings with Plaintiff and these executives.  (*Id.* at ¶¶ 53-56).

Plaintiff does not dispute that Petrower submitted an extremely negative review of Plaintiff's performance as a project manager.  (LaPorta Ex. 14).  She argues, however, that this review was the result of a request from LaPorta to submit negative feedback about Plaintiff, pointing out that Petrower's e-mail to which that review was attached asks whether that "'form [went] to anyone besides'" LaPorta.  (Lyman Aff. ¶ 56 n.6 (quoting LaPorta Ex. 14)).  Indeed, Plaintiff argues that the e-mail bespeaks Petrower's discomfort with, and lack of support for, the content of her own review.  (*Id.*).

### (b)   The 2007 Talent Development Plan

Perhaps the most notable contradiction between Defendants' account of this period and Plaintiff's rebuttal relates to the 2007 Talent Development Plan. Defendants claim that the 2007 Plan was the result of "formally counsel[ing Plaintiff to improve her behavior," and that Plaintiff was "instructed to take [certain] corrective actions" to remediate her performance.  (Def. 56.1(a) ¶¶ 29, 31).  Plaintiff contends that the Talent Development Plan is not remedial at all, but rather was designed to help Plaintiff target improvement areas to assist her in seeking promotion.  (Lyman Aff. ¶¶ 14-15).  The difference between these

accounts is significant; it would weigh even more heavily against Defendants if in fact they have mischaracterized a program, actually designed to help Plaintiff gain a promotion, as a program assigned to her because her poor work performance and serial misbehavior required formal remediation.

The remarks memorialized in Plaintiff's 2007 review apparently confirm Plaintiff's version of events and cast question on Defendants' account: the 2007 review indicates that Plaintiff "was chosen as a candidate for the talent acquisition plan" in which "she willingly participated and was committed to improvement on the topics revealed during the process," which the reviewer indicated reflected Plaintiff's "serious [commitment] to this institution and department by her continued effort in improving her skills and customer service." (Cohn Ex. 6 at 25).  This document, contemporaneous with the 2007 Plan itself and prepared far in advance of the ultimate breakdown in Plaintiff's relationship with Defendants, suggests that the 2007 Plan was indeed actually promotional.  In addition, the "final warning" first delivered to Plaintiff at the end of October 2009 notably makes no reference whatsoever to the 2007 Plan, which is at the very least a curious omission.  (LaPorta Ex. 16)

Plaintiff was indeed promoted in 2008, after she was assigned to complete the 2007 Plan.  (Lyman Aff. ¶ 5).  Oddly, Barbaro insisted in her deposition that Plaintiff was never promoted (Barbaro Dep. 26:20-27:3); LaPorta, on the other hand, acknowledged that Plaintiff had been promoted from Project Manager to Senior Project Manager in 2008 (LaPorta Dep. 78:11-16).  The fact of Plaintiff's promotion, ignored and to a certain extent obscured

by Defendants, stands in some tension with their claims that her tenure from its very beginning in July 2006 was marked by interpersonal conflict and poor work performance.  Regardless, the temporal relationship between the 2007 Plan and Plaintiff's 2008 promotion at least bolsters Plaintiff's claim that the Plan was indeed "promotional" (Lyman Aff. ¶ 15) and, correspondingly, undermines Defendants' insistence that the Plan was a "correctional process" (Def. 56.1(a) ¶ 26).

### (c)    Performance Reviews

Defendants point to the records of Plaintiff's formal reviews for the years 2006, 2007, and 2008 as evidence of her long history of poor performance.  But though these reviews indisputably contain certain remarks identifying interpersonal approach as a professional development goal, they also generally reflect a positive assessment of Plaintiff's work performance as a whole.  For example, Defendants point to a single sentence of Plaintiff's 2006 review in which she was reminded "continue to be mindful of team aspect as an essential part of Project Management, for both internal co-workers/clients and external consultants/vendors."  (LaPorta Ex. 1 at 4).  Defendants obviously think this line is significant, as they specifically identify it in their Local Rule 56.1 statement (Def. 56.1(a) ¶ 28) in the context of an ostensible "correctional process" Plaintiff was ordered to undergo with the goal of remediating flaws in her work history (*id.* at ¶¶ 26, 27, 29, 31).[11]  Yet this line from the 2006 review

---

[11]    This purported "correctional process" is another topic of marked dispute, of which more below.

seems entirely untethered from the class of complaints Defendants allege were the running theme of Plaintiff's employment at the Hospital.

Plaintiff's 2007 review rated her "Solid" or "Strong" in every skill category and contains almost no negative commentary.  On the contrary, the review includes, among other encomia, that Plaintiff "managed several projects where communication to many levels and crossing over to the university was critical, and she was successful." (Cohn Ex. 6 at 24).  The only apparently negative remark the Court could locate for the year 2007 — during which period, if Defendants' story is credited, Plaintiff was assigned to a correctional program to remediate her poor work performance — is that Plaintiff "must be mindful to be concise in her communication of project details to users and internal supervisors." (*Id.*).  A lack of concision seems a far cry from the kind of systematic inappropriate behavior Defendants now claim defined Plaintiff's career at the Hospital.  This is all the stranger given that Defendants contend they received, during the period the 2007 review memorializes, a complaint from Francine with Empire Office Furniture so serious it drove LaPorta to inform Plaintiff that her future at the Hospital was in peril.  (Def. 56.1(a) ¶¶ 32-33).

Defendants rely much more heavily on Plaintiff's 2008 review to support their case.  And indeed the 2008 review contains several pieces of negative feedback relating to communications skills, including that there had been "complaints" regarding Plaintiff's "tone in communicating [with] team members during times of high stress." (LaPorta Ex. 8 at 9).  There is no question that

such complaints existed; it seems likely that the review refers most directly to complaints on the part of Hospital executives Meisner and Petrower from November 2008. (*Id.* at Ex. 7). Yet as noted above, the true significance of this incident, the existence of which is not in question, is heavily disputed. Among other things, LaPorta swore that following the incident she was forced to attend every meeting with Plaintiff and these executives, while Plaintiff insists that that testimony is demonstrably false. (*Compare* LaPorta Aff. ¶ 13, *with* Lyman Aff. ¶¶ 53-56).

### (d)    Records from Fall 2009

Plaintiff also argues that the record from the fall of 2009 has been contrived to show her in an unjustifiably adverse light. For example, Defendants point to a specific September 15, 2009 meeting as an example of Plaintiff's inappropriate behavior. (Def. 56.1(a) ¶¶ 42-44). This meeting, as noted above, took place one day after the opening of the Heart Atrium inaugurated the sudden, climactic period of intense negative commentary on Plaintiff's work performance. Plaintiff submits that the September 15 meeting was a much less antagonistic encounter than has been portrayed, and one marked by the obstructive behavior of other individuals, especially Cindy Lawrence. (Lyman Aff. ¶ 24). Similarly, relying on a memorandum she wrote on December 3, 2009, Plaintiff contends that the subsequent meeting with LaPorta, Waldner, and Plaintiff on October 6, 2009, did not involve Plaintiff's bad behavior but, on the contrary, a show of antagonism by Plaintiff's supervisor LaPorta (*id.* at ¶ 51; Cohn Ex. 17 at 15). And relying on the same

December 3, 2009 memorandum, Plaintiff insists that the October 13, 2009 meeting involving Plaintiff, Waldner, LaPorta, and Barbaro was actually efficient and cooperative, unlike the picture of obstruction and difficulty Defendants paint.  (Cohn Ex. 17 at 5).

While Defendants point to the October 28, 2009 "note to file" calling itself a "final warning" regarding Plaintiff's conduct, Plaintiff avers that Donna Barbaro, her supervisor's supervisor, expressly told Plaintiff that she did not have to read, "worry about," or sign that document, and immediately began discussing whether Plaintiff would like to transfer to a different facility with different personnel; Plaintiff memorialized these remarks in her own "note to file" regarding her conversation with Barbaro.  (Lyman Aff. ¶ 51; Lyman Dep. 60:21-61:23; Cohn Ex. 17 at 1).

In sum, Defendants have sought to present a history of these events in which Plaintiff was a problematic employee throughout her tenure whose eventual firing was inevitable.  Yet many of the facts to which they point in support of that account are far from the straightforward episodes of bad behavior they contend.  It is perhaps most troubling that Defendants' version of Plaintiff's performance during 2007 and 2008 seems to be at least thrown into serious question by the documentary evidence.  Given all the above, a jury could reasonably conclude that Defendants mischaracterized Plaintiff's work history and find that the nondiscriminatory basis Defendants offer now for terminating Plaintiff's employment is an after-the-fact pretext.

40

### ii.      Plaintiff Has Shown a Discriminatory Rationale

Plaintiff has also provided sufficient evidence for a jury to conclude that the true reason for her firing was discrimination against her plans to seek medical leave for her disability.  Plaintiff argues that she told Defendants on several occasions that she intended to seek medical leave after completing the major construction project of the Heart Atrium at the Hospital.  (Pl. Opp. 4-5; Lyman Aff. ¶¶ 16, 37, 38, 40-45).  Only after this event did Defendants begin to contrive a record of her work performance that provided an apparently neutral justification for her termination.  Furthermore, Defendants only decided to terminate her employment, she contends, when she had at last made a formal request for medical leave at 7:23 a.m. on December 16, 2009, repeated again twice later that morning.  Plaintiff argues in conclusion that this timing, combined with Defendants' denial that the first, smoking-gun 7:23 a.m. e-mail ever existed, indicates Defendants' true discriminatory intent.  (Pl. Opp. 13).

On the basis of these arguments a jury could, especially if it agreed with Plaintiff that numerous of Defendants' factual claims are inventions or false interpretations of the record, conclude that she was indeed discharged for discriminatory reasons.  Plaintiff has sworn repeatedly that Defendants had been on notice for some time that she would seek medical leave to deal with her hip problem after the Heart Atrium project concluded.  (*See, e.g.*, Lyman Aff. ¶¶ 41, 44, 45).  That milestone was reached on September 14, 2009.  (*Id.* at ¶ 47; Cohn Ex. 14 at 14).  Beginning the very next day, Plaintiff's record suddenly burgeons with reports of interpersonal conflicts, insubordinate

behavior, disputes with vendors, antagonistic confrontations with co-workers and supervisors, and poor work performance.  (Def. 56.1(a) ¶¶ 42-65).  Plaintiff first received a "final warning" that her job was in peril six weeks later, on October 28, 2009.  (*Id.* at ¶ 54).

These episodes, if true, could — despite all of the foregoing questions about the record — provide an adequate basis for Plaintiff's discharge.  Yet the timing of this sudden, intense period of workplace disputes, coming as it does immediately after the Heart Atrium opened and Plaintiff's allegedly long-forecast medical leave grew imminent, could also allow a jury to conclude that Defendants had in reality decided to create a basis for firing Plaintiff before she could make good on her plans to request medical leave.  This is especially true given the number of individual items of evidence whose characterization by Defendants has been put into doubt by Plaintiff's testimony and the documentary record.

By no means is the record unambiguously in Plaintiff's favor.  After all, there is substantial evidence of very severe conflicts between Plaintiff, certain vendors such as Waldner, co-workers such as Cindy Lawrence, and Plaintiff's supervisor LaPorta.  Nor is it clear that Plaintiff's disability was as obvious and well-known as Plaintiff contends or that Plaintiff had ever indicated that she expected to take medical leave in the future.  Plaintiff herself relies on certain evidence whose significance she may have substantially mischaracterized, such as implying that her doctors' visits and medical leave in October 2009 were related to her hip pain (Lyman Aff. ¶ 48), when it seems that that leave was

42

actually motivated by significant pain in her head and eye (Lyman Dep. 41:6, 43:10-19, 124:23-125:4; *id.* at Ex. 10).  It is not even clear that Plaintiff requested medical leave via an e-mail sent at 7:23 a.m. on December 16 (and thus that Defendants falsely claimed the e-mail to be a fabrication); it may well be the case that Plaintiff requested medical leave after she was summoned to her discharge meeting (and thus that Plaintiff fabricated the 7:23 a.m. e-mail in support of this lawsuit).  But all of that is merely to say that issues of material fact remain regarding whether Defendants' rationale for firing Plaintiff was in fact discriminatory.  Summary judgment must then be denied as to Plaintiff's disability discrimination claims against the Hospital under the ADA, the NYSHRL, and the NYCHRL.

### 3. Summary Judgment Is Denied as to Plaintiff's Aiding and Abetting Disability Discrimination Claims

#### a. Aiding and Abetting Disability Discrimination Claims Generally

The NYSHRL provides that "it shall be an unlawful discriminatory practice 'for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so.'" *Feingold* v. *New York*, 366 F.3d 138, 157-58 (2d Cir. 2004) (quoting N.Y. Exec. Law § 296(6)). The Second Circuit has explained that an employee who "actually participates in the conduct giving rise to a discrimination claim," may be liable for NYSHRL aiding-and-abetting liability.  *Tomka* v. *Seiler Corp.*, 66 F.3d 1295, 1317 (2d

Cir. 1995).[12]  The NYCHRL contains a similar aiding and abetting provision. *Henry-Offor* v. *City Univ. of New York*, No. 11 Civ. 4695 (NRB), 2012 WL 2317540, at *5 (S.D.N.Y. June 15, 2012) (citing N.Y.C. Admin. Code § 8-107(6)).  As the "pertinent language of the two laws is 'virtually identical,'" applying the same standard under the NYSHRL and the NYCHRL is appropriate, especially where, as here, concluding that liability exists for the asserted offense.  *Meyer* v. *New York Office of Mental Health*, No. 12 Civ. 6202 (PKC), 2014 WL 1767818, at *7 (E.D.N.Y. May 2, 2014) (quoting *Feingold*, 366 F.3d at 158); *see also id.* at *7 n.9 ("Although the NYCHRL has been amended since *Feingold*, and in some circumstances demands a separate analysis, the amendments did not limit liability under the NYCHRL, but rather expanded it. *See Mihalik*, 715 F.3d at 109. Accordingly, no additional analysis of the NYCHRL is necessary.").

### b.    Material Fact Issues Exist Concerning LaPorta's Liability

Plaintiff pleaded aiding and abetting against LaPorta individually. Defendants' only response is that these claims should be dismissed because, "[s]ince Plaintiff cannot establish that [the Hospital] engaged in discrimination, there is no individual aiding and abetting liability against LaPorta.'"  (Def. Br. 20 n.15).  The Court has already explained why summary judgment will not

---

[12]    This is unquestionably a strange legal standard, as it seems to indicate that, as relevant here, LaPorta could "'have aided and abetted her own acts.'"  *Tully-Boone* v. *N. Shore-Long Island Jewish Hosp. Sys.*, 588 F. Supp. 2d 419, 427 (E.D.N.Y. 2008) (quoting *Perks* v. *Town of Huntington*, 96 F. Supp. 2d 222, 228 (E.D.N.Y. 2000)).  But "until the Second Circuit revisits the issue, *Tomka* is the law in this [C]ircuit."  *Perks*, 96 F. Supp. 2d at 228.

issue as to Plaintiff's underlying allegations of disability discrimination against the Hospital.  LaPorta swore in her affidavit that she decided to terminate Plaintiff's employment and told Plaintiff that she was being discharged. (LaPorta Aff. ¶¶ 30, 33).  If the Hospital is eventually found liable for discriminatory conduct against Plaintiff, LaPorta could subsequently be found liable for aiding and abetting that conduct.  *Tomka*, 66 F.3d at 1317. Accordingly, summary judgment is denied as to Plaintiff's aiding and abetting disability discrimination claim against LaPorta.

### 4. Summary Judgment Is Denied in Part and Granted in Part as to Plaintiff's Retaliation Claims

#### a. Retaliation Generally

Title V of the ADA prohibits discrimination in the form of retaliation against any individual who "has opposed any act or practice made unlawful by this chapter."  42 U.S.C. § 12203(a).  ADA retaliation claims are also analyzed under the *McDonnell Douglas* framework.  *Treglia*, 313 F.3d at 719.

In order to make out a prima facie case of retaliation, a "plaintiff must establish that [i] [he] was engaged in an activity protected by the ADA, [ii] the employer was aware of that activity, [iii] an employment action adverse to the plaintiff occurred, and [iv] there existed a causal connection between the protected activity and the adverse employment action."  *Weissman* v. *Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000).  Making requests for reasonable accommodations for a disability is protected activity within the contemplation of the statute.  *Rodriguez* v. *Atria Sr. Living Grp., Inc.*, 887 F.

Supp. 2d 503, 512 (S.D.N.Y. 2012) (citing *Weixel* v. *Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002)).

### b.   Material Fact Issues Exist Concerning Plaintiff's Retaliation Claim Arising from Her Discharge

As noted above, Plaintiff expressly limited her disability discrimination claim to address the termination arising, she contends, from her request for medical leave.  To the extent her retaliation claim arises from the same conduct, summary judgment is denied for the same reasons explained above.

### c.   Material Fact Issues Exist Concerning Plaintiff's Aiding and Abetting Retaliation Claims Arising from her Discharge

For exactly the same reasons that summary judgment was denied for Plaintiff's other claims arising from her discharge, summary judgment is denied as to Plaintiff's aiding and abetting retaliation claims against LaPorta as well.

### d.   No Material Fact Issues Exist Concerning Plaintiff's Retaliation Claims Arising from Post-Employment Discrimination

Also as noted above, Plaintiff's retaliation claim appears intended to address both the termination of her employment, which is the sole basis for her disability discrimination claim, as well as the post-termination retaliation she alleges.  However, Plaintiff's brief does not set forth any post-termination retaliation claims, and her affidavit addresses post-termination events in only two paragraphs.  (Lyman Aff. ¶¶ 26-27).  Plaintiff makes a number of startling assertions in her affidavit with no support whatsoever.  First, she swears that, during Plaintiff's employment with Stony Brook after her termination from the

Hospital, she learned that WBE had disclosed to Stony Brook the existence of a "lawsuit" she had filed against the Hospital. (*Id.* at ¶ 27). Second, she submits in a footnote that whatever reference had been made regarding a "lawsuit" was a reference to the filing of an EEOC complaint that preceded this action. (*Id.* at n.2). Third, she asserts in the same footnote that "[WBE], after a disclosure to them by LaPorta that there was a lawsuit by [Plaintiff] against [the Hospital], disclosed the existence of a law suit to Stony Brook...." (*Id.*).

There is no basis in the record for these allegations. The only fact Plaintiff possesses on this topic is that "someone at Stony Brook asked" her if she were suing the Hospital. (Lyman Dep. 202:25-203:3). She testified, on the basis of this question from a Stony Brook employee, that "[s]omeone from [the Hospital] *had* to have told someone at [WBE]." (*Id.* at 204:5-7) (emphasis added). She also testified that her only basis for even suspecting that LaPorta — or, for that matter, anyone else[13] — had ever communicated anything at all to WBE on this topic was her belief that WBE had then communicated information regarding the pending complaint to Stony Brook. (*Id.* at 204:14-21).

In other words, Plaintiff has no reason to believe that LaPorta or anyone else told anyone about her EEOC complaint, much less that that information was communicated to someone at WBE, and she has no separate reason to believe that anyone communicated anything to Stony Brook regarding that

---

[13]     In Plaintiff's estimation, the only person with knowledge of the then-pending EEOC complaint was LaPorta. (Lyman Dep. 204:11-13)

complaint.  Allegations this speculative, supported by nothing beyond Plaintiff's *ipse dixit*, cannot support a prima facie case of retaliation.  *Sarno* v. *Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) ("Where, however, there is no admissible evidence that the statements of the former employer caused or contributed to the rejection by the prospective employer, the plaintiff has failed to present a prima facie case.").

Defendants' motion for summary judgment is granted as to Plaintiff's claims for post-employment retaliation.

### e.    No Material Fact Issues Exist Concerning Plaintiff's Aiding and Abetting Retaliation Claims Arising from Post-Employment Discrimination

"'Aiding and abetting is only a viable theory where an underlying violation has taken place.'"  *Caravantes* v. *53rd St. Partners, LLC*, No. 09 Civ. 7821 (RPP), 2012 WL 3631276, at *20 (S.D.N.Y. Aug. 23, 2012) (quoting *Falchenberg* v. *New York State Dept. of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009) (summary order)).  Because "the Court has granted Defendants' motion for summary judgment with respect to" Plaintiff's post-termination retaliation claims against the Hospital, there is no possibility of aiding and abetting liability on this score against LaPorta, and summary judgment is granted to these claims as well insofar as they arise from post-employment retaliation.  *Ya-Chen Chen* v. *City Univ. of New York*, No. 11 Civ. 0320 (RA), 2014 WL 1285595, at *12 (S.D.N.Y. Mar. 31, 2014).

### f.   No Material Fact Issues Exist Concerning Plaintiff's Tortious Interference Claim

Under New York law, a claim for tortious interference with business relations requires that a Plaintiff identify: "[i] business relations with a third party; [ii] the defendant's interference with those business relations; [iii] the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and [iv] injury to the business relationship." *Nadel* v. *Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000). Plaintiff pleaded this claim against LaPorta "in the alternative" (Am. Compl. 20), apparently with respect to her claims against LaPorta for aiding and abetting post-employment retaliation. She has never explained in any way how this claim might be supported by evidence and, as with many of her claims, she addressed it not at all in her brief opposing Defendants' motion. As explained above, those claims have been dismissed because Plaintiff has offered no evidence at all indicating that LaPorta engaged in any conduct interfering with Plaintiff's post-termination employment in any way. For the same reason, summary judgment is granted against Plaintiff's tortious interference claim. "[M]ere suspicions are inadequate to support a claim for tortious interference with business relations." *Scutti Enterprises, LLC.* v. *Park Place Entm't Corp.*, 322 F.3d 211, 217 (2d Cir. 2003).

## CONCLUSION

It bears noting that, though Plaintiff has evaded summary judgment, she has done so by a very narrow margin. Defendants' motion failed only because Plaintiff benefited from the drawing of every conceivable inference in her favor,

as is appropriate at the summary judgment stage for the non-moving party.  A jury, however, will not be obliged to exercise the same solicitude for her claims.

For the reasons set out above, summary judgment is DENIED as to Plaintiff's claims for disability discrimination, retaliation, and aiding and abetting the same against the Hospital and LaPorta, respectively, insofar as those claims arise from the termination of her employment.  Summary judgment is GRANTED as to Plaintiff's claims for retaliation and aiding and abetting retaliation against the Hospital and LaPorta, respectively, insofar as those claims arise from alleged post-termination conduct, and as to Plaintiff's tortious interference with business relations claim against LaPorta.

The Clerk of Court is directed to terminate the motion pending at docket entry 73.  The parties are hereby ORDERED to appear for a pretrial conference on **August 12, 2014**, at **2:30 p.m.**, in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007.

SO ORDERED.

Dated:      July 14, 2014
            New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

50